On Remand from the Supreme Court of the United States
Our first opinion in this case was issued on November 17, 1995. On application for rehearing, this Court withdrew that opinion and issued a new opinion, dated April 26, 1996. That opinion is published at 684 So.2d 685. On certiorari review, the Supreme Court of the United States vacated this Court's judgment and remanded this case for us to determine whether the punitive damages awarded in this case are reasonable under the guidelines established by the Supreme Court inBMW of North America, Inc. v. Gore, 517 U.S. 559,116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). See Life Ins. Co. of *Page 526 Georgia v. Johnson, ___ U.S. ___, 117 S.Ct. 288,136 L.Ed.2d 207 (1996)(memorandum).
In our April 26, 1996, opinion, we summarized the facts as follows:
 "Ms. [Daisy L.] Johnson, a resident of Grove Hill, Alabama, is an 84-year-old woman who went through the third grade in school and who spent her life as a domestic worker. Because Ms. Johnson had dealt with [Life Insurance Company of Georgia] for over 25 years, paying premiums on nine different policies, she trusted its agents. Sometime before January 8, 1990, a Life of Georgia agent, Barbara Holt, came to Ms. Johnson's home to collect the monthly premiums on her existing policies. Ms. Holt recommended that Ms. Johnson purchase a Medicare supplement policy. The next week Ms. Holt returned and again discussed the Medicare supplement policy with Ms. Johnson, who agreed to purchase the policy. Ms. Johnson testified that Ms. Holt told her that the Medicare supplement policy would protect her. She testified: 'If I got in the hospital, you wouldn't have to worry about your doctor bill, you could stay in there because they would pay your doctor bill, and I got it.' Ms. Holt filled out the application for Ms. Johnson.
 "At first, Barbara Holt testified that she asked Ms. Johnson for her Social Security card; later, she testified that she asked Ms. Johnson for her Medicaid card and that she asked the questions on the application, one of which was whether Ms. Johnson was on Medicaid. At trial, Ms. Johnson disputed Ms. Holt's testimony that she was asked whether she was on Medicaid. Ms. Johnson showed the jury how she gave her cards to Ms. Holt, by pulling a vinyl holder out of her purse. She testified that she always kept her cards in this vinyl holder, which contained her Medicaid, Medicare, and Social Security cards.
 "Despite the fact that Ms. Holt knew that it was illegal and against company policy to sell a Medicare supplement policy to Ms. Johnson, because she was on Medicaid, Ms. Holt completed the application and collected the premiums on the policy. Initially the premiums were $71 per month; by 1992, they had risen to $103 — almost one-third of Ms. Johnson's fixed income. Over almost a three-year period from 1990 through 1992, Ms. Johnson paid a total of $3,132 in premiums on this policy."
684 So.2d at 687-88.
Ms. Johnson sued Life Insurance Company of Georgia ("Life of Georgia"), alleging that it had engaged in intentional and reckless fraud and fraudulent suppression by selling her a Medicare supplement insurance policy that was worthless to her because she was eligible for Medicaid. The jury returned a verdict in favor of Ms. Johnson, assessing compensatory damages at $250,000 and punitive damages at $15 million. Life of Georgia moved for a new trial or for a remittitur of damages. The trial judge held a hearing pursuant toHammond v. City of Gadsden, 493 So.2d 1374 (Ala. 1986), GreenOil Co. v. Hornsby, 539 So.2d 218 (Ala. 1989), and § 6-11-23(b), Ala. Code 1975.[1] Following the hearing, the trial judge, pursuant to Ala. Code 1975, § 6-11-21, ordered a remittitur of the punitive damages award to $12.5 million, and this remittitur was accepted by the plaintiff. This Court affirmed, conditioned upon the plaintiff's filing in this Court a remittitur of $7.5 million, resulting in an award of $5 million in punitive damages. 684 So.2d at 702. On remand from the United States Supreme Court, we affirm the judgment of the trial court, conditioned upon the plaintiff's filing in this Court a $9.5 million remittitur of punitive damages, reducing the punitive damages award to $3 million.
After we issued our April 26, 1996, opinion in this case, the United States Supreme Court granted certiorari review in this case, *Page 527 
along with several other cases involving jury verdicts awarding punitive damages. In its BMW opinion, the Supreme Court addressed the constitutional challenge to such verdicts and announced a decision requiring states to judicially review jury verdicts that award punitive damages, to determine whether such verdicts violate the tortfeasor's rights under the Due Process Clause of the United States Constitution. The Supreme Court emphasized that this postverdict judicial review must be meaningful, with special emphasis being given to three "guideposts": (1) the degree of reprehensibility of the defendant's conduct, (2) the ratio of punitive damages to the amount of actual or potential harm suffered by the plaintiff, and (3) a comparison of the amount of the jury's verdict with civil or criminal penalties (if any) that could be imposed under the law for comparable misconduct. BMW, 517 U.S. at ___ _ ___, 116 S.Ct. at 1598-1603.[2] This Court, on the Supreme Court's remand of BMW, discussed these guideposts in BMW of NorthAmerica, Inc. v. Gore, 701 So.2d 507 (Ala. 1997) ("BMW II").
It is ironic, or at least curious, that the United States Supreme Court has selected mostly Alabama cases to examine for constitutional deficiencies in jury verdicts, because since 1915, long before it was thought to be mandated by the Federal constitution, Alabama has required judicial review of jury verdicts for excessiveness.[3] In reviewing the cases remanded to us for reconsideration in light of the Supreme Court's BMW opinion, we have done our best to give effect to every requirement we can read into the BMW opinion and to the requirements of Alabama law for post-verdict review as set forth in Hammond, Green Oil, and § 6-11-23(b), Ala. Code 1975.[4]
 1. Degree of Reprehensibility
In discussing the first guidepost, the United States Supreme Court stated:
 "Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct. As the Court stated nearly 150 years ago, exemplary damages imposed on a defendant should reflect 'the enormity of his offense.' . . . This principle reflects the accepted view that some wrongs are more blameworthy than others. Thus, we have said that 'nonviolent crimes are less serious than crimes marked by violence or the threat of violence.' . . . Similarly, 'trickery and deceit' . . . are more reprehensible than negligence."
BMW, 517 U.S. at ___, 116 S.Ct. at 1599. (Citations and footnotes omitted.) Alabama courts consider this "guidepost" in the excessiveness review mandated in Green Oil Co. v. Hornsby,539 So.2d 218 (Ala. 1989). This "guidepost" was enumerated as the second factor in the Green Oil analysis, but the factors set out there were not listed in any particular order of importance, insofar as the weight to be given them was concerned.
The trial judge wrote the following in the Hammond order:
 "Clear and convincing evidence was presented at trial that Life of Georgia was aware of the fraudulent sale of these Medicare supplement policies. Considering the degree of reprehensibility of Life of Georgia's conduct, this Court considered the duration of the conduct, the degree of the awareness of the hazard which the conduct caused or [that] is likely to be caused in any concealment, cover-up or failure to *Page 528 
remedy that hazard, and the existence and frequency of similar past conduct. Evidence was submitted at the trial that another lawsuit had been filed in Mobile County Circuit Court alleging activity almost identical to the [activity] presented in the instant situation. Plaintiff further produced clear and convincing evidence through the testimony of three live pattern witnesses that Life of Georgia's conduct in selling these policies to elderly, uneducated, single black women was not an isolated event and had not ceased and these people were paying a very substantial portion of their fixed income for useless policies. Evidence was presented at trial that Life of Georgia was aware of the unfitness of its agent in selling this specialized type policy. Eric Peek testified that he trained Barbara Holt for Life of Georgia yet gave her no training relative to the Medicare supplement policies because he himself did not receive training to enable him to understand and properly sell these policies. Evidence was presented at trial that Life of Georgia began marketing the Medicare supplement policies in 1986 and that continuing through the date of the verdict in June of 1994, Life of Georgia had done nothing to ferret out and correct the problem. In fact, Life of Georgia's corporate officers testified during the Plaintiff's presentation of her case that Life of Georgia had done nothing to try to prevent the sale of Medicare supplement policies to unqualified persons even though in 1992 Life of Georgia had been faced with trial in Mobile County and experienced an adverse verdict. The Court can only conclude from Life of Georgia's failure to produce any rebuttal testimony as to Life of Georgia's failure to remedy this problem once it became known (approximately three years before trial) that Life of Georgia's conduct is egregious and callous disregard for the rights of Alabama adjusters [sic]. Further, the Court considers the status of the Plaintiff and those situated similarly to her in making this ruling."
Our independent review of the evidence indicates that it supports the trial court's characterization of the evidence. Robert M. Hayes, vice president for marketing, testified that in 1986 Life of Georgia began marketing a Medicare supplement policy and that it was not of major concern to the company that a Medicare supplement policy might be sold to customers who were on Medicaid. Hayes testified that question 12 on the application asks whether the person is covered under a state Medicaid program and that it was the responsibility of the Life of Georgia manager to give the agent materials to study in order to know how to handle a particular product. Hayes testified that, so far as he knew, Life of Georgia had undertaken no study to find out if any of the Medicare supplement policyholders were, because of Medicaid coverage, not qualified; nor had Life of Georgia reimbursed any policyholders for premiums.
Eric Peek, a former Life of Georgia agent, testified that he was told by his boss, Jack Neidermayer, not to keep the agents out of the field more than three days for training, but to get them out there and produce business. He described the "debit" business as going out to the house to collect the monthly premium from the policyholder. Peek testified that the company training was based more on the psychological aspects of persuasion than anything else. He further testified that persons aged 65 to 85 were the target group for the sale of Medicare policies. He stated that the three reasons people will buy insurance are love, greed, or fear, and that fear was the main motivation of those persons over age 65. Peek stated that while out in the field he encountered a woman who had gotten Medicaid coverage after buying a Life of Georgia Medicare supplement policy. He said he asked the Life of Georgia manager, Jack Neidermayer, what to do in that situation and that he was told to tell the woman to keep the insurance because she could come off of Medicaid and, if she did, would need the Medicare supplement. Peek testified that agents were pressured to produce the quotas required by the company or else be gone. Peek testified that on one occasion he was with the agent who was collecting premiums from Daisey Johnson. He said that on that occasion Ms. Johnson told them she could no longer afford the coverage, because, she said, the premiums were too high. Peek said he showed her an article from a Mobile *Page 529 
newspaper that told of a couple who had lost their home to a medical center because of a judgment, and that Ms. Johnson then paid the premium. Peek testified that while he was employed with Life of Georgia he suggested to the regional vice president, Jack Neidermayer, that the company should find the people who were in income brackets for Medicaid and refund their premiums. Neidermayer responded by saying that they needed to find people that would buy insurance. Peek testified that Life of Georgia never undertook any action to correct the problem of selling the Medicare supplement policy to people who were not qualified.
Another former Life of Georgia agent, James Russell Clark, testified that his training could be summed up in three words: "Get the money." He described his only training for the job as picking up information by going with other agents on sales interviews and in servicing the existing business.
Life of Georgia's corporate officers testified during the plaintiff's presentation of her case that Life of Georgia had done nothing to try to prevent the sale of Medicare supplement policies to unqualified persons even though in 1992 Life of Georgia had been faced with trial in Mobile County and had experienced an adverse verdict of $1 million. See Foster v. Life Ins. Co. of Georgia, 656 So.2d 333
(Ala. 1994). The company continued its history of noncompliance, giving rise to the conclusion that even a million dollar sanction against the company was not sufficient to deter its misconduct.
In discussing the degree-of-reprehensibility guidepost, the United States Supreme Court stated that, just as nonviolent crimes are less serious than violent crimes, trickery and deceit are more reprehensible than negligence. BMW, 517 U.S. at ___, 116 S.Ct. at 1599. The Court went on to say that repeated misconduct is more reprehensible than an individual instance of malfeasance. Id., 517 U.S. at ___, 116 S.Ct. at 1600.
Applying the first guidepost, the reprehensibility of the defendant's conduct, we conclude that the evidence was sufficient to permit the jury to conclude that Life of Georgia's egregiously improper conduct was sufficiently reprehensible to give rise to tort liability and was sufficient to establish the high degree of culpability that warrants a substantial punitive damages award. Life of Georgia was aware that its actions or omissions were causing harm, but it did not change its policy. It consciously disregarded the rights of old, indigent, and uneducated citizens of Alabama.
 2. Ratio of Punitive Damages to the Actual or Likely Harm
As to the second guidepost, the United States Supreme Court noted that the "most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff," and it noted "[t]he principle that exemplary damages must bear a 'reasonable relationship' to compensatory damages."BMW, 517 U.S. at ___, 116 S.Ct. at 1601. The Supreme Court rejected the notion that a purely mathematical formula could mark the constitutional line:
 "Of course, we have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual and potential damages to the punitive award. . . . Indeed, low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine. . . . In most cases, the ratio will be within a constitutionally accepted range, and remittitur will not be justified on this basis."
517 U.S. at ___ _ ___, 116 S.Ct. at 1602-03. (Citations and emphasis omitted.)
In considering BMW on remand, this Court rejected the "easy answer of adopting one ratio that would apply to all." This Court stated that "[t]o do so would frustrate the purpose of punitive damages, which is to punish and deter a defendant's misconduct." BMW II, supra, 701 So.2d at 513. *Page 530 
It is instructive to note that within a short time after it released its BMW decision, the United States Supreme Court denied certiorari review of several cases that were before it on excessiveness claims:
 1. The Supreme Court refused to review a case from the Court of Appeals for the Ninth Circuit that affirmed a $2.8 million compensatory award and a $14 million punitive award, about a 5:1 ratio. Liberty Mutual Ins. Co. v. Chemstar, Inc., ___ U.S. ___, 116 S.Ct. 1847 [134 L.Ed.2d 948] (1996).
 2. The Court refused to review a 10th Circuit case that affirmed a judgment awarding $284,000 in compensatory damages and $2,250,000 in punitive damages, a ratio of almost 8:1. Wolfberg v. Greenberg, ___ U.S. ___, 116 S.Ct. 1847
[134 L.Ed.2d 948] (1996) (mem.).
 3. The Supreme Court denied certiorari review in a freedom-of-speech case from the 9th Circuit in which the plaintiff was awarded $200 in compensatory damages and $78,500 in punitive damages, a ratio of 393:1. The trial court had also awarded the plaintiff attorney fees and costs. Murray v. Laborers Union Local No. 324, 55 F.3d 1445 (9th Cir. 1995). cert. denied, ___ U.S. ___, 116 S.Ct. 1847 [134 L.Ed.2d 948] (1996).
 4. The Court refused a second review of Honda Motor Co. v. Oberg. On remand after the United States Supreme Court's first review (512 U.S. 415, 114 S.Ct. 2331 [129 L.Ed.2d 336] (1994)), the Oregon Supreme Court had affirmed, again, the entire $5 million punitive award based on a verdict in a personal injury/products liability case arising out of a child's injury on an all-terrain vehicle. See 320 Or. 544, 888 P.2d 8 (1995) (on remand). The punitive-compensatory ratio was 5.4:1. See Honda Motor Co. v. Oberg, ___ U.S. ___, 116 S.Ct. 1847 [134 L.Ed.2d 948] (1996) (mem. denying certiorari review).
 5. In a Maryland case, the jury awarded $104,000 in compensatory damages, plus interest, and $3 million in punitive damages. The trial court reduced the punitive damages to $1.5 million because the defendant's net worth was only $3 million; the reduced award gave a punitive-compensatory ratio of almost 15:1. Fraidin v. Weitzman, 93 Md. App. 168, 611 A.2d 1046
(1992), cert. denied, 329 Md. 109, 617 A.2d 1055
(1993), cert. denied, ___ U.S. ___, 116 S.Ct. 1846
[134 L.Ed.2d 948] (1996).
See Bruce J. McKee, The Implications of BMW v. Gore for FuturePunitive Damages Litigation: Observations from a Participant, 48 Ala. Law Rev. 175, 195-97 (Fall 1996) (discussing those five cases). The United States Supreme Court's disposition of those cases leads us to conclude that the Court recognizes that varying ratios might be sustainable, depending upon all of the factors, with special emphasis on the guidelines.
In Union Security Life Insurance Co. v. Crocker, [Ms. 1931672, August 15, 1997] ___ So.2d ___ (Ala. 1997), also decided today, this Court affirmed a punitive damages award, conditioned upon the plaintiff's filing a remittitur reducing the award from $2 million to $1 million. This Court found in that case that while the defendant Union Security's misconduct was highly reprehensible, the misconduct was an aberration for Union Security. The conduct of Life of Georgia in this case was far more reprehensible than that of Union Security. The financial impact Life of Georgia's conduct had on Daisey Johnson greatly exceeded the financial impact Union Security's conduct had on the Crockers. Although it is not stated in the Union Security case, common sense suggests that the Crockers' payments on the premium of $1,659.61 for the credit life policy sold to them did not amount to one third of their income. If it had, the bank would not have lent them the mortgage money in the first place.
Unlike Dr. Gore and other BMW purchasers, who the United States Supreme Court concluded were not threatened with any additional potential harm by BMW's nondisclosure policy, and unlike the Crockers, who experienced an "isolated occurrence" in Union Security, the plaintiff here proved that there was a sizable group of Alabama citizens who were put at risk by the defendant's wrongful conduct. She proved that over 116,000 Alabamians have both Medicare and *Page 531 
Medicaid; given the Medicare and Medicaid eligibility standards, we can conclude that these Alabamians are both old and poor.
Applying the Supreme Court's second guidepost, we conclude that following the remittitur of punitive damages to $3 million, as we order today, the ratio of exemplary damages to the compensatory damages of $250,000 will bear a reasonable relationship, given the facts in this case.
 3. Sanctions for Comparable Misconduct
The third guidepost stated by the United States Supreme Court in BMW is "[c]omparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct." 517 U.S. at ___, 116 S.Ct. at 1603. The Supreme Court stated that a reviewing court engaged in determining whether a punitive damages award is excessive should " 'accord "substantial deference" to legislative judgments concerning the appropriate sanctions for the conduct at issue.' " Id., 517 U.S. at ___, 116 S.Ct. at 1603, quotingBrowning-Ferris Industries of Vt., Inc. v. Kelco Disposal,Inc., 492 U.S. 257, 301, 109 S.Ct. 2909, 2934, 106 L.Ed.2d 219
(1989) (O'Connor, J., concurring in part and dissenting in part).
In our April 26, 1996, opinion in this case, we took judicial notice of the fact that the Alabama Insurance Code does not provide strong sanctions for insurance fraud:
 "Alabama citizens who become the victims of fraud have little recourse other than through litigation. The record in this case is replete with expert testimony to the effect that the State Insurance Department has little power to regulate agents, and we judicially know that litigation is often the only weapon defrauded citizens have. Punitive damages have historically been part of the remedy for such victims, and to get that remedy they must prove that the defendant intentionally inflicted the injury for which punishment is sought.
684 So.2d at 693. A willful violation of the Alabama Insurance Code is punishable as a misdemeanor, by a fine of not more than $1,000 or by imprisonment in the county jail, or by a sentence to hard labor for the county for a period not to exceed one year or by both such a fine and imprisonment or hard labor, in the discretion of the court. Ala. Code 1975, §§ 13A-5-11, 13A-5-12(a) (part of the Criminal Code); and §§ 27-1-12, 27-12-17, and 27-12-23 (part of the Alabama Insurance Code). See Pacific Mutual Life Ins. Co. v.Haslip, 499 U.S. 1, 23, 111 S.Ct. 1032, 1046, 113 L.Ed.2d 1
(1991). The Alabama Criminal Code provides that theft by deception of more than $1,000 of another's funds is a Class B felony, punishable by imprisonment for 2 to 20 years. §13A-8-3; § 13A-5-6(a)(2). As this Court noted on remand in BMWII, supra, "under the Alabama Deceptive Trade Practices Act, Ala. Code 1975, § 8-19-5, the maximum sanction for committing a fraudulent act against an Alabama consumer is . . . $2,000." 701 So.2d at 514. This Court concluded: "Because the legislature has set the statutory penalty for deceitful conduct at such a low level, there is little basis for comparing it with any meaningful punitive damages award, particularly where the defendant is wealthy and the profit gained from the fraudulent act is substantial." 701 So.2d at 514.
Applying the third guidepost, we find that in this case, as in BMW II and in Union Security, there is no basis for comparing the statutory penalty for deceitful conduct with any meaningful punitive damages award.
In its April 26, 1996, opinion reviewing the jury verdict in this case, this Court set forth procedures for bifurcating a trial in which a jury awards punitive damages, adopting the procedures recommended by Justice Houston in his special concurrence in Charter Hospital of Mobile, Inc. v. Weinberg,558 So.2d 909 (Ala. 1990). See 684 So.2d at 696-97. Also in our April 26, 1996, opinion, 684 So.2d at 697-99, we held that, to prevent undeserved windfalls to successful plaintiffs, where a jury awards punitive damages a part of the award must be paid to the state general fund. We now hold that the judicial review required by the Supreme Court of the United States in BMW v.Gore, coupled with the procedure already established by this court in Hammond and Green Oil, are sufficient safeguards to assure that no tortfeasor found by a jury to merit punishment *Page 532 
by an award of punitive damages is denied due process. We also hold that bifurcation of trials is not necessary to assure that tortfeasors receive due process. We also conclude that it is not necessary to share punitive awards with the state treasury in order to prevent windfalls to those who pursue claims against tortfeasors. Therefore, that portion of our April 26, 1996, opinion establishing a bifurcation procedure, see 684 So.2d at 696, is overruled, and that portion of the April 26, 1996, opinion requiring an allocation of punitive damages, see 684 So.2d at 697, is also overruled. Trials of cases in which punitive damages are sought and awarded will continue to be conducted in one phase, in which the jury will determine the question of liability and, upon finding liability, will assess punitive damages. The admissibility of evidence in such trials will be determined by the same evidentiary principles that applied before we issued our April 26, 1996, opinion in this case.
Where jury verdicts are challenged as excessive, the trial courts will continue to conduct hearings pursuant toHammond, Green Oil, BMW, and § 6-11-23(b). A trial court conducting such a hearing will then apply the Hammond, GreenOil, and BMW factors, as well as the considerations stated in §6-11-23(b), to review the damages award and determine whether the evidence warrants a remittitur of the jury's verdict. If a punitive damages award is appealed, the appellate court will conduct its own review of the punitive damages award, in accordance with Hammond, Green Oil, and BMW.
On remand, we have thoroughly reviewed the evidence and the law in this case, in light of the United States Supreme Court's holding in BMW and this Court's holding on remand inBMW II, supra, as well as the holdings in previous cases of both this Court and the United States Supreme Court. In our April 26, 1996, opinion reviewing the jury verdict in this case, we outlined the Hammond-Green Oil factors and concluded that an award of $5 million in punitive damages was not excessive for punishment and deterrence specific to Life of Georgia, considering all of the facts of the case:
 "We conclude, as did the trial judge, that the conduct of this defendant was egregious and reprehensible and resulted in a great financial hardship to some of the most vulnerable members of our society. Life of Georgia fraudulently sold policies to people on Medicaid that were totally worthless to the victims of the fraud. Life of Georgia had no risk under these fraudulently sold policies. The practice was a sham and would never have been permitted in this state if the activities of insurance agents were properly regulated. However, as reprehensible as Life of Georgia's conduct was, it is not the most [odious] this Court has been required to review. Without in any way condoning the conduct, we nevertheless are compelled, when comparing this conduct with other acts perpetrated upon Alabama citizens, to reduce the award against the defendant Life of Georgia to $5 million. Pacific Mutual Life Insurance Co. v. Haslip, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). It is the opinion of this Court that $5 million is not excessive for punishment and deterrence specific to Life of Georgia, considering all of the facts of this case."
684 So.2d at 700-01. (Footnote omitted.)
We now reconsider specifically each of theHammond-Green Oil factors, as set forth above. First: Whether there is a reasonable relationship between the punitive damages award and the harm likely to result from the defendant's conduct, as well as the harm that actually has occurred. Justice Breyer, in his concurring opinion in BMW v. Gore, categorized "tricking the elderly out of their life savings" as among the "most serious kinds of misrepresentations." 517 U.S. at ___, 116 S.Ct. at 1605-06. Certainly, that serious kind of misrepresentation occurred in this case to Daisey Johnson, who was defrauded out of one-third of her fixed monthly income.
Second: The degree of reprehensibility of the defendant's conduct, including the duration of that conduct, the defendant's awareness, any concealment, and the existence and frequency of similar past conduct. The record establishes that Life of Georgia's corporate officers were aware that some of its salespeople were acting wrongfully, but did *Page 533 
nothing to prevent it and did not act to remedy the situation. The trial judge stated in his Hammond order:
 "Next, the president of Life of Georgia testified that Life of Georgia ceased doing business in Alabama and would never return. He also testified that if any policyholder of Life of Georgia had been sold a Medicare supplement policy who had received Medicaid benefits, that person's premiums would be immediately refunded. He further stated that Life of Georgia had undertaken a program in Alabama to determine whether there were any policyholders situated such as Daisey Johnson. However, the Court is aware that following the testimony of Life of Georgia's president, a witness testified by deposition for Plaintiff that her 91-year-old father was on Medicaid, had been sold a Medicare supplement policy, and that she had demanded Life of Georgia to return his premiums. Ms. Pernell, the daughter of the person sold the Medicare supplement policy, was informed by Life of Georgia that they would not refund the premiums. This testimony contradicts that of the president and concerns the Court as to the quality of Life of Georgia's assertion that it would refund premiums once an unqualified policyholder came forward.
As previously stated, theft by deception of more than $1,000 is a Class B felony that is punishable under the Criminal Code by imprisonment for 2 to 20 years. Ala. Code 1975, §13A-8-3. The trial judge found in his Hammond order that Life of Georgia's conduct was reprehensible:
 "The harm which was committed is even more egregious because Life of Georgia refuses to admit or concede any wrongdoing whatsoever and merely [attributes] the sale of this policy [to] a 'miscommunication.' Life of Georgia has profited from such 'miscommunications.' "
Third: The profitability to the defendant of the wrongful conduct and the desirability of removing that profit and of having the defendant also sustain a loss. While the actual profitability of the sale of these policies to Life of Georgia is not known, we do know that Life of Georgia had no risk under these fraudulently sold policies.
Fourth: The financial position of the defendant. The trial judge stated in his Hammond order:
 "This Court finds that the economic impact of the verdict on Defendant Life of Georgia is slight. In 1993, the company had assets exceeding $2.3 billion. Investment income alone totaled $173 million for 1993 and the company has over $1.1 billion in reserve. The company has testified that it has sufficient resources to pay the judgment if it should be affirmed. The financial position of Life of Georgia does not support any reduction in this verdict."
During the Hammond hearing, Life of Georgia's president, James C. Brooks, Jr., was questioned on cross-examination: "If you are required to pay the $15 million, it would not put Life of Georgia out of business; will it?" Mr. Brooks replied, "That payment alone by itself would not put Life of Georgia out of business."
Fifth: All the costs of litigation. In reference to the costs of litigation, the trial judge stated in hisHammond order:
 "The Court finds that the verdict should be high in order to encourage a plaintiff such as this, and her attorneys, to pursue this type of case. The Court is of the opinion that there are many people situated such as Plaintiff who are unable due to sickness, age, infirmity or whatever to pursue such a case. The Court has considered whether the cost of this litigation favors remittitur and is of the opinion that this factor does not weigh in favor of reducing this verdict."
Sixth: The imposition of any criminal sanctions on the defendant for its conduct must be taken in mitigation. No criminal sanctions have been imposed upon Life of Georgia.[5] *Page 534 
Seventh: The existence of other civil awards against the defendant for the same conduct, these also to be taken in mitigation. Life of Georgia suffered an adverse verdict of $1,000,000 in Foster v. Life of Georgia, supra. We must view this fact as militating against the punitive damages award.
We have reexamined the record in this case and we have reviewed the verdict for excessiveness, both under our established standards and in light of the additional factors set out by the Supreme Court in BMW. We have also reexamined the evidence to determine whether Alabama's interest in protecting its citizens from the kind of fraud practiced by Life of Georgia and in punishing tortfeasors and deterring others can be achieved by a lesser award. On reexamination, we conclude that an award of $3 million in punitive damages will advance Alabama's policy of punishing and deterring the kind of conduct of which the jury has found Life of Georgia guilty.
After careful and thoughtful consideration, we conclude that the portion of the trial court's judgment awarding compensatory damages in the amount of $250,000 is due to be affirmed. However, we conclude that the award of punitive damages should be reduced to $3 million. The judgment is affirmed, on the condition that the plaintiff, within 28 days of the date of this opinion, file in this Court a remittitur reducing the punitive damages to $3 million. If the plaintiff does not file such a remittitur, then the judgment shall be reversed and the defendant granted a new trial. Also, as indicated earlier in this opinion, our April 26, 1996, opinion is overruled to the extent it established a bifurcation procedure and required an allocation of punitive damages.
AFFIRMED CONDITIONALLY.*
ALMON, KENNEDY, and COOK, JJ., concur.
BUTTS, J., concurs specially.
HOOPER, C.J., and MADDOX, HOUSTON, and SEE, JJ., concur in part and dissent in part.
[1] Section 6-11-23(b) requires a trial judge to conduct a hearing or to receive additional evidence, or both, concerning an award of punitive damages, upon motion of either party. Admissible evidence includes evidence indicating whether the defendant has been guilty of the same or similar acts in the past, evidence indicating the nature and extent of any effort the defendant made to remedy the wrong, and evidence indicating the opportunity or lack of opportunity the plaintiff gave the defendant to remedy the wrong complained of.
[2] In addition, the United States Supreme Court stated that in order to avoid encroachment on the policy choices of other States, "the economic penalties that a State such as Alabama inflicts on those who transgress its laws, whether the penalties take the form of legislatively authorized fines or judicially imposed punitive damages, must be supported by the State's interest in protecting its own consumers and its own economy." 517 U.S. at ___, 116 S.Ct. at 1597. Life of Georgia now attempts to argue that the closing argument of counsel for the plaintiff was improperly based upon speculation concerning out-of-state conduct. There was no objection to the closing argument made at the time; therefore, there is nothing to review.
[3] Ala. Acts 1915, Act No. 542, now codified at § 12-22-71, Ala. Code 1975 (statute held constitutional in Alabama Power Co.v. Talmadge, 207 Ala. 86, 93 So. 548 (1921)).
[4] The parenthetical expression appearing in the last sentence of subsection (b) has been held unconstitutional. Armstrong v.Roger's Outdoor Sports, Inc., 581 So.2d 414 (Ala. 1991).
[5] We note the obvious, however. Corporations cannot be put in jail, and a corporation acts only through its agents. Alabama's policy of protecting its citizens from fraud would hardly be advanced by prosecuting debit agents for theft. It goes without saying that the only way to punish a corporation is by way of a monetary award.
* Note from the reporter of decisions: On September 3, 1997, the Supreme Court issued a "certificate of judgment of affirmance," noting that "the appellee, Daisey L. Johnson, did on August 20, 1997, file in this Court a remittitur reducing the punitive damages to $3,000,000." The certificate stated "IT IS NOW CONSIDERED, ORDERED AND ADJUDGED that the judgment of the circuit court for punitive damages be reduced to $3,000,000 and, as thus reduced, the judgment of the circuit court is hereby affirmed, with interest and costs. IT IS FURTHER ORDERED AND ADJUDGED that the appellant, Life Insurance Company of Georgia, pay the costs of appeal and the costs taxed against the defendant in the court below will stand as taxed."