584 S.E.2d 120

COLLINS ENTERTAINMENT CORP., Respondent,

v.

COATS AND COATS RENTAL AMUSEMENT, d/b/a Ponderosa
Bingo and Shipwatch Bingo, Wayne Coats, individually,
and American Bingo & Gaming Corp., Defendants,

Of whom American Bingo & Gaming Corp. is, Appellant.

No. 3596.

Court of Appeals of South Carolina.

Heard Dec. 10, 2002.

Decided Feb. 3, 2003.

Withdrawn, Substituted and Refiled July 21, 2003.

Timothy G. Quinn, of Columbia, for Appellant.

Stephen L. Brown, Edward D. Buckley, Jr., Donald J. Davis, Jr. and Stephen P. Groves, Sr., all of Charleston, for Respondent.

GOOLSBY, J.:

Collins Entertainment Corp. (Collins) brought this action against (1) Coats and Coats Rental Amusement, d/b/a Ponderosa Bingo and Shipwatch Bingo, (2) Wayne Coats, individually, and (3) American Bingo & Gaming Corp. (ABG), alleging various causes of action arising out of ABG's removal of Collins' coin machines from Ponderosa Bingo and Shipwatch Bingo. The case was referred to the Charleston County master-in-equity for trial with authority to enter a final judgment. ABG appeals (1) the master's finding that it intentionally interfered in a lease for the placement of Collins' video poker machines in the two business establishments and (2) the punitive damages award. We affirm.

## FACTS

T.A. Coats and his wife Darlene owned or operated a business known as Coats and Coats Rental Amusement. Wayne Coats, their son, also appears to have been involved in the business.

Coats and Coats Rental Amusement operated two bingo halls, Ponderosa Bingo and Shipwatch Bingo, at two different locations. The locations had been procured by T.A. Coats subject to written real estate leases between him and the individual property owners.

On March 28, 1996, Collins entered into a six-year lease agreement with "Coats and Coats Rental Amusements d/b/a Ponderosa Bingo and Shipwatch Bingo and Wayne Coats, individually" for the exclusive right to lease video poker machines at both locations. The parties were to split the revenues from operating the machines. The agreement further provided that, if the premises were sold, the buyer was to assume the lease. Wayne Coats signed the agreement individually and on behalf of Coats and Coats Rental Amusement.

In 1997, ABG entered into negotiations with T.A. Coats to purchase the assets of the Ponderosa and Shipwatch businesses and to assume the ground leases to the properties on which they operated. The purchase and sale agreement required Coats and Coats to indemnify ABG in the event ABG was sued for interfering with the video poker machine contract. Although T.A. Coats made ABG aware of the agreement with Collins, ABG did not assume the lease and instead removed Collins' machines from the premises.

Collins then brought this action against Coats and Coats, Wayne Coats, and ABG. In its complaint, Collins asserted a claim for breach of contract against Coats and Coats and Wayne Coats. Collins further asserted causes of action for intentional interference with a contract, civil conspiracy, and unfair trade practices against ABG.

At trial, the master dismissed the civil conspiracy cause of action and found in favor of ABG on the unfair trade practices claim. The master, however, determined ABG was liable for intentional interference with Collins' contract and awarded actual damages of $157,449.66 and punitive damages of $1,569,013.00.[1] The master denied ABG's post-trial motions.

1. The master awarded Collins damages for breach of contract against Wayne Coats and Coats and Coats Rental Amusement.

## LAW/ANALYSIS

### I. Motion to Amend Answer

ABG first contends the master erred in denying its motion to amend its answer to conform to the evidence presented at trial. We find no error.

In its answer, ABG stated: "This Defendant admits purchasing the businesses known as Ponderosa Bingo and Shipwatch Bingo from Coats & Coats Rental Agreement and Wayne Coats individually." Before calling any witnesses, Collins' attorney read this statement into the record verbatim without objection from ABG. At trial, however, Wayne Coats testified that he had no ownership interest in either business when ABG acquired them.

After the close of ABG's case, Collins' attorney again read the answer into the record. This time, however, ABG moved to amend the answer to conform to the proof. In support of the motion, counsel for ABG claimed: "At the time the [a]nswer was drafted, that was the information provided us. We would ask that the [p]leadings be conformed to the proof presented." [2] Collins objected to the motion, alleging the entire litigation was based on the admission in ABG's answer. The master denied the motion to amend.

Citing Rule 15(b) of the South Carolina Rules of Civil Procedure, ABG argues the master should have permitted it to amend its answer to conform to the proof offered.[3] We

---

**2.** At the hearing, ABG never specified exactly how it sought to have the answer amended. On appeal, ABG asserts it purchased the ground leases to the property from T.A. Coats and that Wayne Coats had no interest in the property.

**3.** Rule 15(b), SCRCP, states in pertinent part:

When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment; but failure so to amend does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the

agree, however, with Collins that Rule 15(b) is inapplicable to this situation. As this court stated in *Sunvillas Homeowners Ass'n v. Square D Co.*:

> The rule covers two situations. First, if an issue *not raised by the pleadings* is tried by express or implied consent of the parties the court may permit amendment of the pleadings to reflect the issue. Second, if *a party objects to the introduction of evidence as not being within the pleadings* the court may permit amendment of the pleadings subject to a right to grant a continuance if necessary.[4]

Here, the issue prompting ABG's motion to amend was raised in the complaint and admitted by ABG; therefore, the first situation did not apply. Moreover, because no objection was made as to any evidence being outside the pleadings, the master could not have permitted an amendment pursuant to the second part of the rule.

## II. Interference with Contractual Relations
### A.

■ ABG asserts Collins failed to prove the elements of intentional interference with contractual relations. In our view, however, the record has sufficient evidence to support a finding that Collins proved each of the necessary elements.

■ "The elements of a cause of action for tortious interference with contract are: (1) existence of a valid contract; (2) the wrongdoer's knowledge thereof; (3) his intentional procurement of its breach; (4) the absence of justification; and (5) resulting damages."[5]

At trial, ABG contended (1) the parties to the contracts for placement of the video poker machines at Ponderosa Bingo and Shipwatch Bingo were Collins, Wayne Coats, and an entity called Coats and Coats Rental Amusement owned by Wayne Coats; (2) the entity known as Coats and Coats Rental

---

court that the admission of such evidence would prejudice him in maintaining his action or defense upon the merits.

4. 301 S.C. 330, 334, 391 S.E.2d 868, 870–71 (Ct.App.1990) (emphasis added).

5. *Camp v. Springs Mortg. Corp.*, 310 S.C. 514, 517, 426 S.E.2d 304, 305 (1993).

Amusement that was owned by Wayne Coats was a North Carolina entity and separate and distinct from the Coats and Coats owned by T.A. and Darlene Coats; and (3) T.A. Coats held the ground lease on the properties where the businesses were located. ABG maintained that, because it negotiated with only T.A. Coats for the ground leases, it could not have interfered with the video poker machine agreement giving Collins the exclusive right to place its machines at Ponderosa Bingo and Shipwatch Bingo, as that agreement did not involve T.A. Coats.

The master, however, found that Coats and Coats was a business "consisting of Wayne Coats' mother and father, T.A. Coats, Wayne Coats, and Darlene Coats" and that "T.A. Coats, Darlene Coats, and Wayne Coats operated various aspects of the Ponderosa and Shipwatch businesses under various trade names including Coats and Coats, Coats and Coats Rental Amusements, and Darlene's Rental and Amusements, all of which were run and controlled by T.A. Coats." The master then determined that the "contract between Collins and Coats and Coats was negotiated by T.A. Coats and signed by Wayne Coats at his direction and under the authority of T.A. Coats." Finally, the master concluded that "T.A. Coats ratified this contract by his actions subsequent to the placement of Collins Machines at the Shipwatch and Ponderosa locations."

In his deposition, T.A. Coats testified he negotiated the contracts for the video poker machines to be placed in the Ponderosa and Shipwatch locations.[6] He further explained that, because he was out of town when Collins' representative brought the machines, he instructed Wayne Coats to sign the contracts so the machines could be left on the premises. Finally, T.A. Coats testified that the Coats and Coats entity that was a party to the Collins agreement was his business and, furthermore, that the Coats and Coats entity that Wayne Coats established was not in existence at that time.[7]

---

6. T.A. Coats died before the final hearing, and his deposition was made part of the record.

7. Indeed, ABG acknowledged in its brief that "[i]n January, 1997 Wayne Coats (the son of T.A. Coats) applied for a business license for a new business known as Coats and Coats Rental Amusements, a North

Based on the foregoing, we hold the record contains evidence to support the master's determination that Collins' contract was with T.A. Coats and not with Wayne Coats. Although Wayne Coats may have signed the agreement, the record supports the finding that he did this only with express authorization from T.A. Coats to act on behalf of T.A. Coats and Coats and Coats Rental Amusement.[8]

## B.

ABG next contends it had no knowledge of any contract between Collins and T.A. Coats and was told that Wayne had the video poker lease. The record, however, supports the finding that ABG knew that T.A. Coats was a party to the contract at issue.

T.A. Coats testified that he told Greg Wilson, Roy Stevens, Richard Henry, and Barry Goldstein, all of ABG, that he had a contract with Collins for the video poker machines. In addition, ten of Collins' video poker machines were present in each location and, as required by state law, were clearly marked as belonging to Collins. T.A. Coats further stated he told individuals at ABG that he was not going to breach the agreement and that ABG had to remove Collins' machines and contact Collins. Roy Stevens, ABG's state manager, testified he knew of the video poker lease with Collins and ABG had a copy of the contract to review. Barry Goldstein testified that a copy of the Collins lease was passed around ABG "like the Sunday comic strip."

## C.

ABG further asserts there was no evidence presented at trial that it either induced or coerced T.A. Coats or Wayne Coats into breaching the video poker lease. We disagree.

---

Carolina entity," and a copy of the application appears in the record. Obviously, ABG knew or should have been able to determine that the Coats and Coats business purportedly run by Wayne Coats may not have been in existence in March 1996, when Collins procured the right to place video poker machines at the two bingo halls.

8. *See Townes Assocs. v. City of Greenville,* 266 S.C. 81, 221 S.E.2d 773 (1976) (stating that, in an action at law, on appeal of a case tried without a jury, the findings of fact will not be disturbed on appeal unless found to be without evidentiary support).

According to Roy Stevens, the purchase and sale agreement was structured in such a way as to circumvent the Collins agreement. Stevens further testified that, if T.A. Coats refused to sell, ABG intended to run him out of business. In addition, Wayne Coats testified that (1) his family never contemplated cancelling the Collins agreement until ABG was involved; (2) an attempt was made to have ABG assume the Collins contract; and (3) a representative from ABG advised his parents that "if they didn't sell out, that American Bingo would eventually run them out."

### D.

Finally, ABG argues it was justified in its actions because it believed that the Collins agreement was with Wayne Coats and that T.A. Coats held only the ground leases on the properties. As discussed above, however, there was ample evidence to show that T.A. Coats was a party to the Collins agreement and that ABG was aware of his involvement.

### III. Expert Testimony

ABG asserts the testimony from Collins' economic expert, Dr. Woodside, regarding Collins' excess capacity of video poker machines was hearsay and, therefore, the master improperly relied on this testimony in calculating damages. We hold the admission of Dr. Woodside's testimony was proper.

Dr. Woodside testified that Collins maintained warehouses with additional machines. He testified that, although he did not know exactly how many machines Collins had in its warehouses, individuals with Collins had informed him that Collins had sufficient excess capacity to fulfill both the contract with T.A. Coats and any subsequent contracts. In addition, Dr. Woodside testified Collins routinely rotated machines from one location to another.

ABG argues that what Collins' employees had told Dr. Woodside was hearsay. We agree the information was hearsay, but hold, however, that it was nevertheless admissible under Rule 703 of the South Carolina Rules of Evidence.[9]

---

9. Dr. Woodside's testimony was also cumulative to other evidence previously admitted into the record without objection. Before Dr.

The admission or exclusion of expert testimony is a matter within the sound discretion of the trial court.[10] With regard to information on which an expert opinion is based, the South Carolina Rules of Evidence provide as follows:

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.[11]

 Here, Dr. Woodside relied on the information provided by Collins' employees to determine how to calculate Collins' damages. In order to do this, he needed to assess Collins' excess inventory of machines vis-à-vis the number of locations it had available in which to place these machines. We therefore hold the hearsay testimony was the "type reasonably relied upon by experts in the particular field" when determining how to calculate damages and the master did not abuse his discretion in admitting the testimony.[12]

### IV. Lost Volume Seller Doctrine

 ABG maintains the master erred in applying the "lost volume seller" doctrine and in holding Collins did not have to mitigate its damages. We disagree.

---

Woodside was called to the stand, Jamie Livingston, an assistant comptroller with Collins, testified that Collins had excess machines numbering "in the thousands" stored in warehouses and that Collins was constantly seeking out new locations to generate money and increase business. *See Jackson v. Speed*, 326 S.C. 289, 305, 486 S.E.2d 750, 758 (1997) ("Where the hearsay is merely cumulative to other evidence, its admission is harmless.").

**10.** *Payton v. Kearse*, 329 S.C. 51, 495 S.E.2d 205 (1998).

**11.** Rule 703, SCRE.

**12.** ABG also argues the testimony violated Rules 403 and 704, SCRE. Because, however, neither objection was raised at trial, the issues have not been preserved for review on appeal. *See McKissick v. J.F. Cleckley & Co.*, 325 S.C. 327, 344, 479 S.E.2d 67, 75 (Ct.App.1996) ("Failure to object when the evidence is offered constitutes a waiver of the right to have the issue considered on appeal.").

■ The theory behind the "lost volume seller" doctrine is as follows:

> If the injured party could and would have entered into the subsequent contract, even if the contract had not been broken, and could have had the benefit of both, he can be said to have "lost volume" and the subsequent transaction is not a substitute for the broken contract. The injured party's damages are then based on the net profit that he has lost as a result of the broken contract.[13]

■ South Carolina does not require a party to make an unreasonable effort to mitigate.[14] Moreover, once Collins showed it had sufficient inventory "to place as many [machines] as it could have found customers for," [15] it likewise established that any other deals it would have made would have been in addition to, rather than instead of, the prior agreement. We therefore affirm the master's use of the "lost volume seller" doctrine in calculating damages in this case.

## V. Punitive Damages

ABG contends the master erred in awarding punitive damages because there was no evidence its actions were willful, intentional, or with reckless disregard of Collins' rights. ABG further contends the amount of punitive damages violated the Due Process Clause of the Fourteenth Amendment. We find no error.

---

13. Restatement (Second) of Contracts § 347 cmt. f (1981); *see also Gianetti v. Norwalk Hosp.*, 64 Conn.App. 218, 779 A.2d 847, 852 (2001) ("Many state courts, as well as judicial commentators, have determined that in appropriate circumstances, the Restatement's lost volume seller theory should be used in awarding damages."); *C.I.C. Corp. v. Ragtime, Inc.*, 319 N.J.Super. 662, 726 A.2d 316 (App.Div.1999) (approving the lost volume doctrine to determine damages relating to coin-operated machine contracts and holding that an instruction on mitigation of damages was reversible error).

14. *See Genovese v. Bergeron*, 327 S.C. 567, 572, 490 S.E.2d 608, 611 (Ct.App.1997) ("A party injured by the acts of another is required to do those things a person of ordinary prudence would do under the circumstances to mitigate damages; however, the law does not require unreasonable exertion or substantial expense for this to be accomplished.").

15. *C.I.C. Corp. v. Ragtime, Inc.*, 726 A.2d at 320.

## A.

"The purposes of punitive damages are to punish the wrongdoer and deter the wrongdoer and others from engaging in similar reckless, willful, wanton, or malicious conduct in the future."[16] "Punitive damages also serve to vindicate a private right of the injured party by requiring the wrongdoer to pay money to the injured party."[17]

South Carolina Code section 15–33–135 provides that "[i]n any civil action where punitive damages are claimed, the plaintiff has the burden of proving such damages by clear and convincing evidence."[18] Nevertheless, the trial court has considerable discretion regarding the amount of damages, both actual or punitive.[19]

In *Gamble v. Stevenson*, the supreme court mandated the following procedure for appellate review of an punitive damages award:

> [T]o ensure that a punitive damage award is proper, the trial court shall conduct a post-trial review and may consider the following: (1) defendant's degree of culpability; (2) duration of the conduct; (3) defendant's awareness or concealment; (4) the existence of similar past conduct; (5) likelihood the award will deter the defendant or others from like conduct; (6) whether the award is reasonably related to the harm likely to result from such conduct; (7) defendant's ability to pay; and finally, (8) ... "other factors" deemed appropriate.[20]

The master based his conclusions on his findings that the actions taken by ABG demonstrated ABG's culpability, awareness of the contract and ultimate concealment of its desire to

---

16. *Clark v. Cantrell*, 339 S.C. 369, 378, 529 S.E.2d 528, 533 (2000).

17. *Id.* at 378–79, 529 S.E.2d at 533.

18. S.C.Code Ann. § 15–33–135 (Supp.2002).

19. *See Miller v. City of W. Columbia*, 322 S.C. 224, 230, 471 S.E.2d 683, 687 (1996) ("The award of actual and punitive damages remains within the discretion of the jury, as reviewed by the trial judge.").

20. 305 S.C. 104, 111–12, 406 S.E.2d 350, 354 (1991). The "other factors" are discussed in *Pacific Mutual Life Insurance v. Haslip*, 499 U.S. 1, 20, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991).

have Collins' contract breached, the harm that was caused, the deterrent effect of a punitive damages award, and ABG's ability to pay.

We hold there was evidence that ABG's conduct was willful, intentional, and in disregard of Collins' rights. Evidence was presented at trial of ABG's intention to run T.A. Coats out of business if he did not agree to its request to purchase his business. ABG was made aware of the agreement between Collins and T.A. Coats, but nevertheless set up the purchase of the Ponderosa and Shipwatch locations in an attempt to avoid having to comply with the provisions of the lease.

As the master noted, ABG was "aware of the fact that Collins would suffer a serious economic loss if its contract was cancelled and Collins' machines were removed." Also, ABG gained from procuring the breach of the contract because it would not have to share the revenues with Collins, but could instead install machines from another source and retain 100 per cent of the profits.

On appeal, ABG focuses on the fact the video poker industry no longer exists and, therefore, there is no opportunity for recidivism. Although the video poker gaming industry is no longer legal in South Carolina, the conduct could nevertheless be continued in other industries. Furthermore, the possibility of future conduct is only one of several factors to consider. Given the egregious conduct by ABG and its total disregard for Collins' rights, we uphold the master's decision to award punitive damages.

## B.

ABG also maintains the amount awarded was excessive and violated the Due Process Clause of the Fourteenth Amendment of the United States Constitution. Although the punitive damages award greatly exceeded Collins' actual damages, we hold the award did not violate due process.

"Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful

conduct and deterring its repetition." [21] "Only when an award can fairly be categorized as 'grossly excessive' in relation to these interests does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment." [22]

As noted by the Supreme Court, "unlimited jury discretion—or unlimited judicial discretion for that matter—in the fixing of punitive damages may invite extreme results that jar one's constitutional sensibilities." [23] Nevertheless, as one commentator has recently noted, "[g]enerally, attorneys should be cautioned against relying on the ratio of punitive to compensatory damages to argue the constitutionality of awards. Although the ratio is a factor universally argued, there is no consistent pattern in its application." [24]

In *BMW of North America v. Gore*, the Supreme Court provided the following "guideposts" for determining the reasonableness of a punitive damages award: (1) the degree of reprehensibility, (2) the ratio of the punitive damages award to the actual harm inflicted on the plaintiff, and (3) the comparison of the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct.[25] We examine each of these three factors as it applies to the present case.

**1.**

"Perhaps the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." [26] In the present case,

---

**21.** *BMW of N. Am. v. Gore*, 517 U.S. 559, 568, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).

**22.** *Id.*

**23.** *Haslip*, 499 U.S. at 18, 111 S.Ct. 1032.

**24.** G. Ross Anderson, Jr., *Punitive Damages: A Funny Thing Happened on the Way to the Courthouse*, S.C. Trial Lawyer Bulletin, Fall 2002, at 12, 13.

**25.** *Gore*, 517 U.S. at 575–76, 116 S.Ct. 1589; *see also Welch v. Epstein*, 342 S.C. 279, 307, 536 S.E.2d 408, 422 (Ct.App.2000) (applying the *Gore* "guideposts" to an analysis of a punitive damages award).

**26.** *Gore*, 517 U.S. at 575, 116 S.Ct. 1589.

ABG's conduct was clearly wrongful, calculated, and improper. ABG intentionally interfered with a contract, and this interference inured to the detriment of one of the parties to the contract. Although ABG argues Collins suffered only economic harm, the degree of reprehensibility was still significant. ABG went to great lengths to ensure that it would get out from under the Collins agreement, be able to place its own machines at the Ponderosa and Shipwatch locations, and then be entitled to indemnification if anything went awry. Moreover, in addition to the unusual indemnification provision in the purchase and sale agreement, there was also evidence that ABG further attempted to insulate itself from liability by creating a shell corporation with no assets in case "the deal went sour." [27]

### 2.

The second factor is the ratio of punitive damages to actual damages. ABG contends a ratio of 10 to 1 is excessive. We disagree. In his order, the master stated the award was "in part based upon [his] firm conviction that American Bingo and others must not be allowed to profit from misconduct of the type established in this case." [28] Moreover, we note that, in recent reported decisions, the appellate courts of this State have upheld punitive damages awards with relationships to the actual damages awarded that have been comparably proportionate to the ratio in the present case, even when the tortious conduct resulted in economic rather physical harm.[29]

---

**27.** Although it did not formally designate this as a separate issue, ABG also vigorously argues in its brief that the award was unfair because all the employees involved in the events related to the lawsuit were no longer associated with the company. We agree with Collins, however, that this fact, even if true, is immaterial in view of the fact that ABG, as a corporation, "is a distinct legal entity." *Todd v. Zaldo*, 304 S.C. 275, 278, 403 S.E.2d 666, 668 (Ct.App.1991).

**28.** *See TXO Prod. Corp. v. Alliance Res. Corp.*, 509 U.S. 443, 460, 113 S.Ct. 2711, 125 L.Ed.2d 366 (1993) ("It is appropriate to consider the magnitude of the *potential harm* that the defendant's conduct would have caused to its intended victim if the wrongful plan had succeeded, as well as the possible harm to other victims that might have resulted if similar future behavior were not deterred."), *quoted in Hundley v. Rite Aid of S.C.*, 339 S.C. 285, 315, 529 S.E.2d 45, 61 (Ct.App.2000).

**29.** *See, e.g., Weir v. Citicorp Nat'l Servs.*, 312 S.C. 511, 435 S.E.2d 864 (1993) (upholding a punitive damages award of $275,000.00 assessed

### 3.

Finally, in *Gore*, the Supreme Court held that state courts, when reviewing punitive damages awards for excessiveness, must "compar[e] the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct." [30] Justice Stevens, writing for the Court in *Gore*, stated that "a reviewing court engaged in determining whether an award of punitive damages is excessive should 'accord "substantial deference" to legislative judgments concerning appropriate sanctions for the conduct at issue.'" [31] In the present case, however, we were not able to locate any "legislative judgments" imposing civil or criminal penalties for tortious interference with a contract, and counsel has not directed our attention to any such statute. In our view, the absence of statutory sanctions for the specific misconduct complained of here poses a dilemma not unlike that in cases in which the reviewing court recognized that the statutory penalty was set at "such a low level, there is little basis for comparing it with any meaningful punitive damages award." [32]

Moreover, we reject ABG's argument that the sanctions provided in the South Carolina Antitrust Act and the South

---

against a finance company for allegedly making a false report of a debt in an action in which the plaintiff received $25,000.00 in actual damages); *Dunsil v. E.M. Jones Chevrolet Co.*, 268 S.C. 291, 233 S.E.2d 101 (1977) (affirming a judgment of $800.00 in actual damages and $5,800.00 in punitive damages in an action for fraud and deceit against a used car dealer); *Lister v. NationsBank of Delaware*, 329 S.C. 133, 152–53, 494 S.E.2d 449, 460 (Ct.App.1997) (applying the *Gamble* test and the guideposts in *Gore* to hold that a punitive damages award of $200,000.00 in an action alleging unauthorized charges on a credit card by a rental car company licensee in which the actual damages award was $8,605.08 "was not unreasonable or grossly excessive so as to violate Avis' due process interests"); *Austin v. Indep. Life & Accident Ins. Co.*, 296 S.C. 156, 370 S.E.2d 918 (Ct.App.1988) (upholding a remitted punitive damages award of $50,000.00 in a fraud action against an insurer, notwithstanding that the plaintiff received only nominal actual damages).

**30.** *Gore*, 517 U.S. at 583, 116 S.Ct. 1589.

**31.** *Id.* (quoting *Browning–Ferris Indus. of Vt., Inc. v. Kelco Disposal, Inc.*, 492 U.S. 257, 301, 109 S.Ct. 2909, 106 L.Ed.2d 219 (1989) (O'Connor, J., concurring in part and dissenting in part)).

**32.** *BMW of N. Am. v. Gore*, 701 So.2d 507, 514 (Ala.1997).

Carolina Unfair Trade Practices Act are for "comparable misconduct." Historically, the availability of these sanctions has not precluded punitive damages awards for related causes of action even when the plaintiff has also recovered under one of these acts in the same lawsuit.[33] In our view, then, these statutory penalties are not necessarily for "similar misconduct" to the extent that they would restrict the right of a finder of fact to determine an aggrieved litigant's entitlement to a well-established form of redress.[34]

Finally, with regard to ABG's allegation that, to date, the largest ratio of punitive damages to actual damages for tortious interference with contractual relations in any reported decision issued in this State is 6 to 1,[35] we find it significant that, notwithstanding the heightened scrutiny by the United States Supreme Court of punitive damages awards in recent cases, the Court has been reluctant to impose a bright-line ratio in a due process analysis.[36] Moreover, the majority in *Gore* observed that "[i]n most cases, the ratio will be well within a constitutionally acceptable range, and remittitur will not be justified on this basis ." [37] In our view, we hold the ratio

**33.** *See, e.g., Smith v. Strickland,* 314 S.C. 192, 442 S.E.2d 207 (Ct.App. 1994) (requiring the plaintiffs to *elect* between recovering punitive damages for fraud and treble damages under the Unfair Trade Practices Act); *Freeman v. A. & M. Mobile Home Sales, Inc.,* 293 S.C. 255, 359 S.E.2d 532 (Ct.App.1987) (upholding a punitive damages award of $40,000.00 in an action for fraud, unfair trade practices, and violations of the consumer protection code, in which the plaintiff recovered $1,751.00 in actual damages on each of her three causes of action).

**34.** *See Life Ins. Co. of Ga. v. Johnson,* 701 So.2d 524, 531 (Ala.1997) (recognizing that insurance fraud victims have "little recourse other than through litigation" and that "[p]unitive damages have historically been part of the remedy for such victims").

**35.** In support of its argument, ABG cited *Kinard v. Crosby,* 315 S.C. 237, 433 S.E.2d 835 (1993) and *Collins v. Terry,* 303 S.C. 358, 400 S.E.2d 783 (Ct.App.1991).

**36.** *See State Farm Mut. Auto. Ins. Co. v. Campbell,* —— U.S. ——, ——, 123 S.Ct. 1513, 1524, 155 L.Ed.2d 585 (2003) ("Nonetheless, because there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where 'a particularly egregious act has resulted in only a small amount of economic damages.'") (quoting *Gore,* 517 U.S. at 582, 116 S.Ct. 1589).

**37.** *Gore,* 517 U.S. at 583, 116 S.Ct. 1589.

of punitive to actual damages in this case, which was less than 10 to 1, was not excessive in view of the evidence of ABG's carefully orchestrated scheme to interfere with Collins' contract and of ABG's attempt to shield itself from liability.[38]

## V. Motion to Supplement

██ ABG contends the master erred in failing to allow it to supplement the record with additional information regarding its financial condition and more recent financial statements. We find no abuse of discretion.

The information ABG purportedly sought to introduce consisted of a letter from an accounting firm concerning the current financial status of Littlefield Corporation, the successor-in-interest to ABG. The certified public accountant who prepared the letter opined that, based on his analysis, the amount of punitive damages awarded represented approximately 27 per cent of the available net equity of Littlefield. ABG maintained this information was not available when the case was tried in September 2000 and did not become available until December 2000.

The master heard the case on September 18, 2000, and his final order was dated February 6, 2001. ABG, however, did not file its motion to supplement the record until March 19, 2001, more than one month after judgment was rendered. Even assuming the information that ABG sought to include in the record was, as ABG contended, unavailable until December 2000, ABG has offered no reason as to why it never moved to supplement the record during the weeks that passed between the time it received the documents and the filing of the master's order and instead waited until after judgment to proffer the information. We hold this reason alone is suffi-

---

**38.** *See Gore,* 517 U.S. at 583, 116 S.Ct. 1589 (noting that "[w]hen the ratio is a breathtaking 500 to 1, however, the award must surely 'raise a judicial eyebrow' ") (quoting *TXO,* 509 U.S. at 481, 113 S.Ct. 2711 (O'Connor, J ., dissenting)); *Continental Trend Res., Inc. v. OXY, USA, Inc.,* 101 F.3d 634, 639 (10th Cir.1996) ("[W]e surmise that in economic injury cases if the damages are significant and the injury not hard to detect, the ratio of punitive damages to the harm generally cannot exceed a ten to one ratio.").

cient to justify the master's denial of ABG's motion to supplement the record.[40]

**AFFIRMED.**

HUFF, J., and BEATTY, Acting J., concur.

---

**40.** *See I'On, L.L.C. v. Town of Mt. Pleasant,* 338 S.C. 406, 526 S.E.2d 716 (2000) (holding an appellate court can affirm a trial court ruling for any reason appearing in the record).