PBI BANK, INC., Appellant

v.

SIGNATURE POINT CONDOMINIUMS LLC; Signature Point Apartments LLC; and Signature Point KTC LLC, Appellees

NO. 2013–CA–001874–MR, NO. 2014–CA–001825–MR

Court of Appeals of Kentucky.

DECEMBER 2, 2016; 10:00 A.M.

Discretionary Review Granted by Supreme Court March 15, 2017.

Petition for Discretionary Review Withdrawn April 19, 2017

702

706

BRIEF AND ORAL ARGUMENT FOR APPELLANT: John T. McGarvey, Eric M. Jensen, Bradley S. Salyer, Louisville, Kentucky

AMICUS CURIAE BRIEF FOR KENTUCKY CHAMBER OF COMMERCE: Edward H. Stopher, Raymond G. Smith, Louisville, Kentucky

AMICUS CURIAE BRIEF FOR KENTUCKY BANKERS ASSOCIATION: Debra K. Stamper, Louisville, Kentucky

BRIEF AND ORAL ARGUMENT FOR APPELLEES: Laurence J. Zielke, Janice M. Theriot, Nancy J. Schook, Louisville, Kentucky

BEFORE: JONES, MAZE, AND STUMBO, JUDGES.

## OPINION

JONES, JUDGE:

These appeals arise out of a judgment entered by the Jefferson Circuit Court following a jury trial. In accordance with the jury's verdict, the trial court awarded the Appellees, Signature Point Condominiums LLC, Signature Point Apartments LLC, and Signature Point KTC LLC, (collectively "Signature Point"), $1,515,000 in compensatory damages plus $5,500,000 in punitive damages for a total of $7,015,000. Alleging numerous assignments of error, the Appellant, PBI Bank, Inc. ("PBI"), asks us to reverse the verdict. Having found no reversible errors, we affirm.

## I. BACKGROUND [1]

A ninety-acre piece of real estate in eastern Jefferson County, Kentucky, lies at the heart of this dispute. Scott Hagan, a prominent real estate developer, formed Signature Point to purchase and develop the property. His goal was to transform it into a unique, upscale residential development consisting of condominiums, apartments, and various community amenities, including a club house. Signature Point acquired the property in 2006 with the assistance of a loan from U.S. Bank.[2]

Eventually, Hagan became dissatisfied with U.S. Bank and began looking for another lender.[3] Hagan had been doing busi-

---

1. The record in this case is voluminous. Extensive pretrial discovery was conducted by the parties prior to a two-week trial at which nineteen different witnesses testified. We summarize only the factual and procedural background necessary to place PBI's assignments of error in the proper context. However, we have carefully reviewed the entire record.

2. The property was divided into three tracts of roughly 30–acres each: the "Apartment Tract," zoned for 414 apartments; the "Condominium Tract," zoned for 299 condomini-

ums and a large clubhouse with a pool, park, and associated amenities; and the "KTC Tract," which was reserved for the Kentucky Transportation Cabinet to expand the interstate interchange at I–64.

3. Hagan testified that his U.S. Bank loan officer told him that U.S. Bank was going to declare Signature Point's loan to be in default because Signature Point had not secured the bank's approval for the clubhouse design before it began construction.

ness with PBI since 1996, and he was personally acquainted with PBI's President and Chief Executive Officer, Maria Bouvette. Bouvette expressed an interest in PBI taking over the financing on the Signature Point project. As a result, on March 8, 2007, PBI and Signature Point entered into a Development and Construction Loan Agreement. Under the terms of this agreement, PBI loaned $25 million to Signature Point. The loan was divided into two equal components, a $12.5 million Revolving Construction Loan and a $12.5 million Revolving Development Loan.[4] The loans were secured by a mortgage on the Signature Point property and by personal guarantees from Hagan, Mark Sneed, James Mims, George McGeheem, and Wendy Hargrove. Repayment of the loans was heavily dependent on the future sales of the condominium units.[5]

The Development and Construction Loan Agreement was amended twice, first on June 20, 2007, and again September 12, 2007. As a result of the amendments, as well as Hagan's intention to obtain financing from King Southern Bank to acquire additional acreage for the Signature Point

property, PBI ordered a new appraisal in the spring of 2008. The appraisal report, dated June 27, 2008, assigned an estimated "as is" market value for the entire project at $22,340,000, allocated as follows: $13,970,000 for the Brownstone Condominium Site; $2,800,000 for the Carriage Home Condominium Site; $1,840,000 for the Cottage Home Condominium Site; and $3,730,000 for the Apartment Site.

As is standard, the Development and Construction Loan Agreement contained a provision whereby Signature Point agreed that it would not permit any additional encumbrances to be placed on the property. In late 2008 or early 2009, one of Signature Point's contractors, Kelsey Construction, filed a $200,000 mechanics lien on the property.[6] The lien constituted an event of default under the Development and Construction Loan Agreement. This gave PBI the right to terminate the loan and declare the entire unpaid balance immediately due and payable in full.

Kelsey Construction eventually filed suit in Jefferson Circuit Court to enforce its mechanics lien. PBI was named as a party due to its interest in the Signature Point

---

4. A revolving loan allows for the loan amount to be withdrawn, repaid, and redrawn again in any manner and any number of times, until the arrangement expires.

5. The repayment provisions provided:

> **4.2 Revolving Development Loan Principal Payments.** In addition to interest monthly, Borrowers shall make principal payments on the Revolving Development Loan in the amount of $122,527.00 per condominium unit via the construction of each unit and paid from the first advance requested on the Revolving Construction Loan for each unit. See section 4.3 for additional principal payments to be made on the Revolving Development Loan from sales proceeds on the condominium units.
>
> **4.3 Revolving Construction Loan Principal Payments.** In addition to interest monthly, Borrowers shall make principal payments in the amount of ninety percent (90%) of

the gross sales price per condominium unit with said payment first being applied towards the revolving construction loan for monies funded towards the affected condominium unit with the remaining sales proceeds being applied as principal payments towards the Revolving Development Loan (see section 4.2). The ninety percent (90%) of the gross sales price requirement will apply only to the first eighty (80) condominium units sold. Beginning with the closing of the eighty-first (81st) condominium unit, the principal payment will only be for the amount funded for the affected condominium unit with the remaining net sales proceeds going to the borrowers.

6. Signature Point disputed that Kelsey Construction was owed this amount. It maintained that Kelsey had not completed the project and had failed to comply with EPA guidelines after nicking an LG&E gas line.

property. As part of that action, PBI sought collection under the Development and Construction Loan Agreement and enforcement of its mortgage. On March 23, 2009, PBI and Signature Point entered into a Global Settlement as related to the Development and Construction Loan Agreement, as well as a separate loan between PBI and Hagan Properties Inc. The Global Settlement Agreement amended the Development and Construction Loan Agreement in several ways, two of which are central to the underlying dispute. First, PBI agreed to a partial release of the apartment portion of the development upon receipt of $2,835,000. Second, PBI agreed to issue a new $2.7 million non-revolving loan to Signature Point. The loan was for a one-year term with interest to be paid monthly. In exchange, Signature Point granted PBI a second mortgage on the Signature Point property and agreed to secure a release of Kelsey Construction's lien.[7] The additional loan was secured by Hagan and Hagan Properties, Inc. Hagan signed the Global Settlement on Signature Point's behalf and Maria Bouvette signed it on PBI's behalf.

Signature Point hoped that the additional infusion of cash from the new $2.7 million non-revolving loan would allow it to market the already constructed condominiums and generate some sales to repay the loans and keep the project moving. It did not. As occurred all over the nation, the local real estate market hit rock bottom. The condominium market was hit especially hard. Mr. Hagan testified that most consumers were not interested in buying condominiums at that time, and the few that were interested generally could not obtain financing. In short, while Signature Point had completed several condominiums, it was unable to sell them despite its additional marketing efforts.

As already noted, pursuant to the Development and Construction Loan Agreement, the principal payments due from Signature Point to PBI were tied heavily to the sale of the condominium units. Since no condominium units were being sold, PBI's loans to Signature Point were not generating anything besides limited interest payments. Additionally, it appeared unlikely that Signature Point would be able to pay off the $2.7 million loan that PBI made to it as part of the Global Settlement when it came due in March of 2010.

On February 10, 2010, Bouvette telephoned Greg Isaacs, Signature Point's accountant, to discuss the PBI loans. Bouvette told Isaacs that the bank regulators had classified the Signature Point loan as "nonperforming." Bouvette informed Isaacs that PBI would not be able to agree to extend the $2.7 million loan from the prior year, and that she had been severely criticized for the way she handled the extension the previous March. Bouvette proposed that PBI would be willing to "take the property back" as a deed in lieu of foreclosure rather than have it as a nonperforming loan.[8] Isaacs communicated Bouvette's interest in taking over the property to Hagan. Hagan expressed in-

---

7. The purpose of loan was pay off the Hagan Properties note, settle the Kelsey Construction lien, fund past due interest as well as interest when due on the Development and Construction Loan Agreement, pay the 2008 real estate taxes due on the Signature Point project, provide up to $50,000 for marketing related to the Signature Point Project, and provide up to $200,000 to be used at Signature Point's discretion.

8. A deed in lieu of foreclosure is a deed instrument in which a mortgagor conveys all interest in a real property to the mortgagee to satisfy a loan that is in default and avoid foreclosure proceedings. Generally, in return, the mortgagee releases the mortgagor from any personal liability associated with the mortgage.

terest in accepting the deal *if* Signature Point could keep the apartment portion of the project.

Between February 17, 2010, and March 29, 2010, the parties negotiated extensively concerning the transfer of the property, particularly the apartment portion. Eventually, they agreed that Signature Point would deed the entire property to PBI in exchange for a full release of all its loan obligations and the personal guarantees. Signature Point would retain only a right of first refusal in the Apartment Tract.

Hagan testified that Bouvette came to his office unannounced on March 30, 2010, asking him to sign the documents necessary to consummate their agreement. Hagan testified that before he did so he asked Bouvette whether PBI knew of anyone interested in buying the Apartment Tract. Hagan testified that Bouvette told him that "no one was interested in the property" and "nobody was negotiating on it." Bouvette testified that she remembered Hagan asking her, "do you know or does the Bank know of anyone else interested in the property?" Bouvette testified, "I remember saying 'there are no offers on the table that I am aware of. No one has written any offers or put in any amount to buy the property. There are no offers on the table.'" According to Hagan, Bouvette also assured him that when he was ready to purchase the Apartment Tract, she would make sure that he was able to do so by pushing the deal through PBI's board.

Whether there were any offers on the table was important to Signature Point because it was in the process of applying to receive a loan from the United States Department of Housing and Urban Development ("HUD") to complete construction on the Apartment Tract. Hagan believed the HUD loan would eventually be approved, but might take some time. Because there was no present interest in the property, Hagan surmised that Signature Point would have time to complete the HUD application and approval process before another buyer materialized.

On March 30, 2010, PBI and Signature Point entered into an agreement whereby Signature Point agreed to transfer fee simple title to the entire Signature Point property to PBI, in full satisfaction of all outstanding loan obligations as well as any and all other obligations that Signature Point and the guarantors owed PBI. Under the terms of this agreement, Signature Point would have a right of first refusal for the Apartment Tract for the next year. The right of refusal provision provided: "the Bank shall deliver a copy of the letter of intent pertaining thereto to the Borrowers, and the Borrowers shall have a period of (14) days following receipt of such letter of intent within which to accept such letter of intent and thereafter purchase the Apartment Tract *on the same terms and conditions as are contained in such letter of intent*."[9] (Emphasis added). The Agreement also contained a provision barring

---

9. In full the provision states:

9. Right of First Refusal. The Bank agrees that for a period commencing on the date hereof and continuing through March 31, 2011, should the Bank determine that it desires to transfer, convey or sell the Apartment Tract or any portion thereof to any other party, the Bank shall deliver a copy of the letter of intent pertaining thereto to the Borrowers, and the Borrowers shall have a period of (14) days following receipt of such letter of intent within which to accept such

letter of intent and thereafter purchase the Apartment Tract on the same terms and conditions as are contained in such letter of intent. If the Borrowers decline to purchase the Apartment Tract or any portion thereof and the proposed third-party transaction does not close, the foregoing right of first refusal in favor of the Borrowers shall remain in full force and effect as to any future proposed sale of the Apartment Tract by the Bank through and including March 31, 2011.

PBI from sharing the "details regarding the transfer of the Property to Bank, and all discussions and correspondence, pertaining thereto" with any third party.[10]

Bouvette's statements on March 30, 2010, that no one else had expressed an interest in the property were incorrect. In fact, just five days earlier, on March 25, 2010, an entity named Managed Assets of Kentucky, LLC, ("Managed Assets") offered, by way of a letter of intent to PBI, to purchase the Apartment Tract for $3.7 million, approximately the same amount PBI's earlier appraisal had assigned to the property.

Managed Assets had been formed several months earlier by Harry Borders, a Louisville attorney, and several others, including Michael Schroering. Managed Assets was set up to buy multi-family properties. Borders and Kevin Riggle, PBI's Vice President in charge of managing and selling PBI's OREO ("other real estate owned") property, had been friends and business partners for a number of years.[11] Riggle had learned earlier from Cliff Radin, another PBI employee, that the Signature Point property would likely be deeded back over to PBI. At trial, Riggle admitted that he told Borders about the fact that PBI was set to acquire the property prior to March 25, 2010. Schroering testified that he heard through Riggle that PBI

might be "taking back" the Signature Point project. Cliff Radin, a loan officer for PBI, acknowledged that "taking back" was synonymous with "we are taking a deed in lieu of foreclosure." Schroering testified that Managed Assets was considering purchasing the Apartment Tract as early as February 2010. On or about March 10, 2010, twenty days before PBI actually acquired the property, Riggle took Schroering on a tour of Signature Point. Schroering testified that around that same time, Riggle also gave him a copy of Signature Point's Development Plan.

On March 16, 2010, Borders wrote to Schroering about making an offer on the Apartment Tract, and noted that he had asked Riggle for the appraisal. Borders testified that he had asked Riggle for the appraisal because he wanted to get a sense of what the Apartment Tract was worth. Riggle denied at trial that he provided Managed Assets with the appraised value. Riggle maintained that it must have been a coincidence that Managed Asset's $3.7 million offer was almost the same value the appraisal assigned to the apartment portion of Signature Point—$3.73 million.

At trial, Bouvette emphatically denied that she was aware of the March 25, 2010, letter of intent when she met with Hagan on March 30, 2010, to sign the deed in lieu

---

**10.** This provisions provides:
 4. Confidentiality. Bank acknowledges that other than the Deed of Property from Borrowers to the Bank, which is of public record all details regarding the transfer of the Property to Bank, and all discussions and correspondence, pertaining thereto, contain confidential and nonpublic information ("the Confidential Information"). Bank agrees that it shall not disclose any Confidential Information to any third party, which obligation shall survive the recordation of the Deed of the Property to the Bank for one (1) year. Bank shall be required to advise each of its employees, board members, agents, contractors, and representa-

tives who have access to any confidence, but in all cases, Bank shall retain responsibility for any breach by an employee, board member, agent, contractor, or representative, or the confidentiality obligations set forth in this Section 4. Bank shall not share any Confidential Information with any purchasers or users of all or any portion of the property.

**11.** Riggle was not a partner in Managed Assets. However, Riggle and Borders had known each other for approximately 18 years and were co-members of another company known as Spalted Investments, LLC, which also was a long-time PBI customer.

agreement. For his part, Riggle testified that he could not be certain whether he sent the letter of intent to Bouvette. Riggle did admit, however, that it was normally his practice to send such letters to Bouvette. He also admitted that he was impressed by the size of the offer in the letter of intent and thought that it was "fantastic."

Signature Point was not able to come up with funds necessary to exercise its right of first refusal, primarily because the HUD loan approval process was still pending. Signature Point filed suit prior to the closing between PBI and Managed Assets. After extensive discovery and several amendments to its complaint, Signature Point's claims were tried before a jury over the course of approximately two weeks. Nineteen witnesses testified at the trial. After Signature Point rested, PBI moved for a directed verdict on all counts. The trial court denied PBI's motion.

Using the instructions provided by the trial court, the jury found for Signature Point on Instruction No. 1 (Fraud); Instruction No. 4 (Negligence); Instruction No. 6 (Tortious Interference with Prospective Business Advantage); Instruction No. 7 (Breach of Contract); Instruction No. 8 (Breach of Duty of Good Faith and Fair Dealing); and Instruction No. 9 (Promissory Estoppel). In verdict Form A, the jury awarded Signature Point $650,000 in "out of pocket damages" and $865,000 in "lost-opportunity damages." In verdict Form B, the jury awarded Signature Point $5.5 million in punitive damages.

After the circuit court denied PBI's motion for judgment notwithstanding the verdict ("JNOV"), or alternatively a new trial, as well as its motion to reduce the post-judgment interest rate, it entered a judgment in accordance with the jury's verdict. This appeal by PBI followed. PBI's appeal alleges numerous assignments of error: 1) the trial court erred when it failed to grant a directed verdict/JNOV as related to fraud, tortious interference, breach of contract, breach of good faith and fair dealing, and promissory estoppel; 2) the fraud, negligence, and tortious interference instructions did not accurately state Kentucky law; 3) the jury rendered an inconsistent verdict; 4) the verdict was impermissibly vague and ambiguous as to damages; 5) allowing "out-of-pocket" damages was clear error; 6) the jury's award amounted to a "double recovery"; 7) there was no evidence of causation or foreseeability to support the jury's damages award; 8) allowing punitive damages was clear error as it was based on improper purposes/claims and there was no evidence presented of an "intent to injure"; 9) the jury's award of punitive damages was excessive; and 10) the trial court abused its discretion by refusing to lower post-judgment interest.

## II. ANALYSIS

### A. Directed Verdict/JNOV

"It is the province of the jury, of course, to weigh the evidence, but a directed verdict is appropriate where there is no evidence of probative value to support an opposite result because the jury may not be permitted to reach a verdict upon speculation or conjecture." *Toler v. Sud–Chemie, Inc.*, 458 S.W.3d 276, 285 (Ky. 2015). However, the trial court "is precluded from entering either a directed verdict [or JNOV] unless there is a complete absence of proof on a material issue in the action, or if no disputed issue of fact exists upon which reasonable men could differ." *Taylor v. Kennedy*, 700 S.W.2d 415, 416 (Ky. App. 1985).

A reviewing court may not disturb a trial court's decision on a motion for a judgment notwithstanding the verdict unless that decision is clearly erroneous. *Bierman v. Klapheke*, 967 S.W.2d 16, 18 (Ky. 1998). "A denial of a directed verdict

or JNOV 'should only be reversed on appeal when it is shown that the verdict was palpably or flagrantly against the evidence such that it indicates the jury reached the verdict as a result of passion or prejudice.'" *Estate of Moloney v. Becker*, 398 S.W.3d 459, 461 (Ky. App. 2013) (quoting *Peters v. Wooten*, 297 S.W.3d 55, 65 (Ky. App. 2009)); *see also Savage v. Three Rivers Med. Ctr.*, 390 S.W.3d 104, 111 (Ky. 2012); *Banker v. Univ. of Louisville Athletic Ass'n, Inc.*, 466 S.W.3d 456, 460 (Ky. 2015). "In determining whether the circuit court erred in failing to grant the motion, all evidence that favors the prevailing party must be taken as true; and the reviewing court is not at liberty to assess the credibility of witnesses or determine what weight is to be given the evidence." *Childers Oil Co. v. Adkins*, 256 S.W.3d 19, 25 (Ky. 2008) (citing *Lewis v. Bledsoe Surface Mining Co.*, 798 S.W.2d 459 (Ky. 1990)).

### 1. Fraud

To succeed on a fraud claim a party must prove the following six elements by clear and convincing evidence: "(1) the defendant made a material representation to the plaintiff; (2) the representation was false; (3) the defendant knew the representation to be false or made it with reckless disregard for its truth or falsity; (4) the defendant intended to induce the plaintiff to act upon the misrepresentation; (5) the plaintiff reasonably relied upon the misrepresentation; and (6) the misrepresentation caused injury to the plaintiff." *Giddings & Lewis, Inc. v. Indus. Risk Insurers*, 348 S.W.3d 729, 747 (Ky. 2011).

PBI asserts that allowing the fraud claim to stand was clear error because Signature Point did not present any proof that Bouvette had actual knowledge of Managed Asset's prior offer and/or inter-

est in the Apartment Tract. PBI explains that Signature Point's "evidence" consisted entirely of inferences, conjecture, and suspicion, and amounted to nothing more than, "Come on—of course Bouvette knew about it!"

Although it is true that mere conjecture or speculation is insufficient to support a claim of fraud, a plaintiff alleging a fraud claim is not required to produce direct evidence to prevail. "The courts of this Commonwealth have long recognized that '(p)arties contemplating the commission of fraud do not usually blow a horn or beat a drum to call attention to what they are doing,' and have accordingly held that frauds may be established by circumstances." *PCR Contractors, Inc. v. Danial*, 354 S.W.3d 610, 616 (Ky. App. 2011) (quoting *Bolling v. Ford*, 213 Ky. 403, 281 S.W. 178 (1926)). "[P]roof [of fraud] may be developed by the character of the testimony, the coherency of the entire case as well as the documents, circumstances and facts presented." *United Parcel Serv. Co. v. Rickert*, 996 S.W.2d 464, 468 (Ky. 1999). This proof can be entirely circumstantial. *Id.; see also Winfrey's Tr. v. Winfrey*, 150 Ky. 138, 150 S.W. 42, 45 (1912). Additionally, it is well-settled that circumstantial evidence "will authorize a submission of the contested issue to the jury," and is capable of sustaining its verdict. *Grant v. Wrona*, 662 S.W.2d 227, 229 (Ky. App. 1983).

Having reviewed the record, we cannot conclude that it was error for the trial court to allow the fraud claim to reach the jury. Although Bouvette did not admit she knew about Managed Asset's offer, PBI produced circumstantial evidence indicating the opposite was true. Riggle testified that his normal course in receiving a letter of intent would be to pass it along to Radin and Bouvette.[12] He further testified that

---

**12.** "Evidence of the habit of a person or of the routine practice of an organization,

whether corroborated or not and regardless

he was very impressed with the size of Managed Asset's offer. Likewise, the evidence as a whole indicated that Bouvette was very involved in the PBI loan and was concerned about it. While the evidence was circumstantial, it was not spun out of whole cloth. It was based on the testimony of witnesses, the documents, and the events and circumstances of the case. When viewed in Signature Point's favor, the evidence supported the actual knowledge element of the fraud claim.

PBI also argues that there was no proof of reasonable reliance. According to PBI, the evidence is clear that Hagan had independent knowledge that some individuals were seen looking at the property prior to making the inquiry of Bouvette on March 17, 2010. PBI explains that Signature Point's resulting lack of reasonable diligence in investigating that independent knowledge leaves Signature Point, as a matter of law, without a remedy for fraud. *If* viewed in a light most favorable to PBI, the evidence might suggest Signature Point acted unreasonably. However, the trial court was required to consider the evidence in Signature Point's favor in assessing whether to grant a directed verdict/JNOV. When viewed in this light, we believe there was ample evidence from which the jury could determine that Signature Point acted reasonably in relying on Bouvette. This is especially true given the long-standing relationship between Hagan and Bouvette. *See PCR Contractors, Inc.,* 354 S.W.3d at 616 (holding that whether there was reasonable reliance was a jury question where the parties had been friends for over twenty years and had done business with each other on many prior occasions); *Cline v. Allis–Chalmers Corp.,* 690 S.W.2d 764, 767 (Ky. App. 1985) (holding that a factor in determining whether a

of the presence of eyewitnesses, is relevant to prove that the conduct of the person or organization on a particular occasion was in con-

person exercised ordinary care in relying upon the misrepresentation of another party is the extent of confidence that person was entitled to place in the other, which could be developed from a prior course of dealing).

### 2. Tortious Interference

Tortious interference with business relations requires: (1) the existence of a valid business relationship or expectancy; (2) that the defendant was aware of this relationship or expectancy; (3) that the defendant intentionally interfered; (4) that the motive behind the interference was improper; (5) causation; and (6) special damages. *Halle v. Banner Indus. of N.E., Inc.,* 453 S.W.3d 179, 187 (Ky. App. 2014). "Tortious interference with a prospective business advantage does not require the existence of a contract." *Snow Pallet, Inc. v. Monticello Banking Co.,* 367 S.W.3d 1, 6 (Ky. App. 2012). "Interference which prevents the making of future contracts is the equivalent of interference which induces the breach of an existing contract." *Henkin, Inc. v. Berea Bank & Trust Co.,* 566 S.W.2d 420, 425 (Ky. App. 1978).

"[I]t is clear that to prevail [on a claim for tortious interference with prospective contractual relations/business advantage] a party seeking recovery must show malice or some significantly wrongful conduct." *Nat'l Collegiate Athletic Ass'n By & Through Bellarmine Coll. v. Hornung,* 754 S.W.2d 855, 859 (Ky. 1988). "The context and the course of the decisions make it clear that what is meant is not malice in the sense of ill will but merely 'intentional interference without justification.' " *Id.* This analysis turns primarily on motive. *Id.*

formity with the habit or routine practice." KRE 406.

PBI asserts that Signature Point did not present any evidence that it had an actual, legitimate expectation of a business relationship with Managed Assets. Its theory is that Managed Assets would have only purchased the property with 10% down and financing for 90% of the purchase price, which Signature Point was not in a financial position to provide. Thus, according to PBI, Signature Point could not have sold the property to Managed Assets for $3.8 million in cash because Managed Assets could not have purchased it for cash.

■ Included in this tort are "interferences with ... the opportunity of selling or buying land or chattels or services." *Restatement (Second) of Torts* § 766B (1979). "A valid business expectancy exists when there is a reasonable likelihood or a probability, not mere wishful thinking that a business relationship will come about." *Ventas, Inc. v. Health Care Prop. Inv'rs, Inc.*, 635 F.Supp.2d 612, 621 (W.D. Ky. 2009) (applying Kentucky law). Of course, the very nature of the tort prevents us from knowing with certainty whether the prospective relationship would have materialized in the absence of interference. *Id.*

Based on the record, we are unable to conclude that the trial court erred in allowing the jury to decide this claim or in failing to set aside its judgment thereon. While PBI presented evidence in the defense of the claim, Signature Point's evidence, when viewed in its favor, was sufficient to support the jury's finding. Signature Point was the property owner at the time Managed Assets became involved. Had it been able to sell the Apartment Tract to Managed Assets, it would have been able to salvage the remainder of the project and realize a modest profit. The jury had sufficient evidence before it from which it could have concluded that PBI worked with Managed Assets in secret with the purpose of making sure any profit realized on the Apartment Tract would be its own and not Signature Point's. The jury could have also inferred that PBI kept information from Managed Assets because it wanted to get the nonperforming loans off its books and would not be able to do so if Signature Point was able to sell the Apartment Tract and bring the non-revolving $2.7 million loan current.

### 3. Breach of Contract

■ The breach of contract claim relates to the right of first refusal contained in the deed in lieu agreement. The provision provides:

9. Right of First Refusal. The Bank agrees that for a period commencing on the date hereof and continuing through March 31, 2011, should the Bank determine that it desires to transfer, convey or sell the Apartment Tract or any portion thereof to any other party, the Bank shall deliver a copy of the letter of intent pertaining thereto to the Borrowers, and the Borrowers shall have a period of (14) days following receipt of such letter of intent within which to accept such letter of intent and thereafter purchase the Apartment Tract on the same terms and conditions as are contained in such letter of intent. If the Borrowers decline to purchase the Apartment Tract or any portion thereof and the proposed third-party transaction does not close, the foregoing right of first refusal in favor of the Borrowers shall remain in full force and effect as to any future proposed sale of the Apartment Tract by the Bank through and including March 31, 2011.

Signature Point's theory under this claim was that PBI breached an obligation to provide Signature Point with the same financing terms it agreed to with Managed Assets when it delivered the May 7, 2010,

purchase agreement. According to PBI, Signature Point failed to offer any evidence that PBI ever received a valid "letter of intent" as defined by Section 9 of the March 30, 2010, agreement. PBI explains that the fact that it received an unsigned letter of intent from Managed Assets on March 25, 2010 (before the right of first refusal was in effect), and a second unsigned letter on April 6, 2010, means nothing because the evidence was that PBI had no desire to sell the Apartment Tract to Managed Assets under the terms and conditions in either of the unsigned letters of intent. PBI asserts that under the plain terms of Section 9, the trigger for providing any letters of intent to Signature Point was PBI's desire to pursue the terms of such letters. It claims that because PBI did not desire to pursue a transaction based on the terms of either unsigned letter of intent, it had no contractual obligation or duty to provide copies of those letters to Signature Point. PBI does not believe that there was ever any document, even the May 7, 2010, purchase agreement, sufficient to trigger the right of refusal clause.

We disagree. The term "letter of intent" is not defined in the agreement. However, it is clear to us from examining the provision in question that the purpose of this provision was to require PBI to give notice to Signature Point when it had reached a decision to sell the property at a specific price and under specific terms. PBI cannot avoid this provision by relying on an overly formalistic characterization of the offer and acceptance process. It is clear to us, just as it was to the trial court, that the Purchase Agreement comes within Section 9, triggering PBI's obligations and Signature Point's right of refusal.

Alternatively, PBI asserts that even if there was a breach of Section 9, it is impossible for Signature Point to show damage because Hagan admitted during trial that he had no financing in place with any lending institution during this time period. This argument requires us to consider whether Section 9 can be fairly read to require PBI to have extended the same financing terms to Signature Point as it did to Managed Assets.

 Our rules for the interpretation of written contracts are well-settled. [T]he interpretation of contracts is an issue of law for the court to decide." *Equitania Ins. Co. v. Slone & Garrett, P.S.C.*, 191 S.W.3d 552, 556 (Ky. 2006). This includes determining whether a contract is ambiguous. *3D Enterprises Contracting Corp. v. Louisville & Jefferson County Metropolitan Sewer Dist.*, 174 S.W.3d 440, 448 (Ky. 2005); *Elmore v. Commonwealth*, 236 S.W.3d 623, 626 (Ky. App. 2007). The intention of the parties as to a written instrument generally must be gathered from the four corners of that instrument. *Equitania*, 191 S.W.3d at 556. However, "if the writing is ambiguous, the factual question of what the parties intended is for the jury to decide." *Id.*; *see also Hunter v. Wehr Constructors, Inc.*, 875 S.W.2d 899, 901 (Ky. App. 1993).

*Clark v. Hectus & Strause PLLC*, 345 S.W.3d 857, 859 (Ky. App. 2011).

The trial court determined that the term "same terms and conditions" contained in the agreement included the same financing terms. PBI contends this was an erroneous interpretation of the agreement because it "cannot be said to have had any legal obligation or 'duty' to extend financing to a borrower that it had just allowed to walk away from $27 million in loans."

Whether PBI had a "legal" obligation to extend credit to Signature Point is not the determinative question. Certainly, in the absence of a contract, PBI could not be required to extend credit to Signature Point. The question, however, is whether

PBI voluntarily obligated itself to do so as part of its deed in lieu agreement with Signature Point. Section 9 says PBI is required to offer Signature Point the same "terms and conditions." PBI would have us interpret "terms and conditions" as limited to price. We cannot agree. When purchasing property from a bank, one would logically expect "terms and conditions" to including financing. *See Kentucky Spirit Health Plan, Inc. v. Commonwealth Fin. & Admin. Cabinet*, 462 S.W.3d 723, 728 (Ky. App. 2016) ("[W]here a contract's terms are plain, a court must assign them their ordinary meaning and enforce the contract as written.").

In sum, we find no error in the trial court's interpretation of Section 9 or its submission of this claim to the jury.

### 4. Breach of Good Faith & Fair Dealing

 "Within every contract, there is an implied covenant of good faith and fair dealing, and contracts impose on the parties thereto a duty to do everything necessary to carry them out." *Farmers Bank & Trust Co. of Georgetown, Kentucky v. Willmott Hardwoods, Inc.*, 171 S.W.3d 4, 11 (Ky. 2005); *see also Ranier v. Mount Sterling Nat. Bank*, 812 S.W.2d 154, 156 (Ky. 1991). In order to show a violation of the implied covenant of good faith and fair dealing, a showing of breach of contract is ordinarily not required; rather, the party asserting the violation must "provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith has engaged in some conduct that denied the benefit of the bargain originally intended by the parties." 23 *Williston on Contracts* § 63:22 (4th ed. 2004). "A contracting party impliedly obligates himself to cooperate in the performance of his contract and the law will not permit him to take advantage of an obstacle to performance which he has created or which lies within his power to remove."

*Ligon v. Parr*, 471 S.W.2d 1, 3 (Ky. 1971) (quoting *Gulf, Mobile & Ohio R.R. Co. v. Ill. Cent. R.R. Co.*, 128 F.Supp. 311, 324 (N. D. Ala. 1954)).

PBI cites *Harvest Homebuilders LLC v. Commonwealth Bank & Trust Co.*, 310 S.W.3d 218, 219 (Ky. App. 2010), for the proposition that pre-marketing property that is expected to come into the bank's portfolio is permissible, whereas entering into a contract to sell property before it is taken into ownership is a breach of the duty of good faith and fair dealing. While PBI did not technically enter into a contract to sell the property prior to taking ownership of it, the evidence supports a conclusion that PBI did far more than "pre-market" the property. Based on the evidence, the jury could have concluded that PBI supplied Signature Point's appraisal and related business plans to Managed Assets for the purpose of persuading it to purchase the property at or above the appraised value, received an offer from Managed Assets, which PBI considered "impressive," misrepresented to Signature Point that PBI did not know of anyone interested in purchasing the property, obtained a deed in lieu from Signature Point without ever communicating its receipt of Managed Assets' offer, sold the property to Managed Assets, with whom it had been discussing the property for some time, and realized a profit for itself. PBI's conduct went well beyond generic pre-marketing activities.

PBI's conduct is more analogous to the facts in *Pearman v. W. Point Nat. Bank*, 887 S.W.2d 366 (Ky. App. 1994). *Pearman* involved a foreclosure action where the bank contracted to sell the property before it actually acquired it at a reduced price, facts somewhat different than those before us. However, we believe the central point of *Pearman* is that the bank knowingly pursued a course of action that allowed it to realize a profit rather than its customer.

In *Pearman*, we found it significant that the bank failed to "adopt a course that would have liquidated its customer's debt in the entirety" and instead chose to "seize an advantageous business opportunity . . . ." We concluded these facts were sufficient to establish that the bank breached its "good faith obligation." *Id.* at 368. The evidence in this case was sufficiently similar, and we cannot conclude that it was error to allow the breach of good faith and fair dealing claim to go before the jury.

### 5. Promissory Estoppel

 Promissory estoppel requires "[a] promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance [and it] is binding if injustice can be avoided only by enforcement of the promise." *Sawyer v. Mills*, 295 S.W.3d 79, 89 (Ky. 2009). According to Signature Point, on February 17, 2010, or March 30, 2010, Bouvette told Hagan that PBI would allow Signature Point to purchase back the Apartment Tract for $3,000,000 in two phases, and this representation induced Hagan to enter into the agreement.

PBI's first argument is that the statute of frauds is a bar to a promissory estoppel claim. In this instance, however, we think the issue is more appropriately framed in terms of whether PBI was barred from relying on the statute of frauds. In *Nicholson v. Clark*, 802 S.W.2d 934, 939 (Ky. App. 1990), this court held that "the doctrine of estoppel may, under the proper circumstances, prevent a party from employing the statute of frauds." The *Nicholson* court explained:

> The vital principle is that he who by his language or conduct leads another to do,

upon the faith of an oral agreement, what he would not otherwise have done, and changes his position to his prejudice, will not be allowed to subject such person to loss or injury, or to avail himself of that change to the prejudice of such other party. The party asserting the estoppel must, therefore, show affirmatively that he has done or omitted some act or changed his position to his prejudice in reliance upon the acts, conduct (active or passive), language, or representations of the person sought to be estopped which he would not have done except for such acts, language or conduct.

*Id.* (quoting 73 Am. Jur. 2d *Statute of Frauds* § 567).

The evidence in this case supported application of estoppel. Hagan testified that Bouvette promised to him on March 30, 2010, as follows, "Please do the right of first refusal with me and I will make our deal right with our board of directors when you need your land for HUD." She said, "Scott look, do the right of refusal, it's got a 14-day period in there, nobody is even interested in the property, nobody has expressed interest, nobody is working a deal on the property. I'll make your deal happen with my board when you need your land for HUD." Hagan further testified that he believed Bouvette when she told him he would get the option. He also testified that Bouvette intended him to rely upon her promise. And, he testified that he did rely on the promise to Signature Point's detriment. Based on these facts, we believe that Signature Point produced evidence of actual fraud sufficient to defeat or prevent PBI from relying on the statute of frauds. *See Rivermont Inn, Inc. v. Bass Hotels & Resorts, Inc.*, 113 S.W.3d 636, 642 (Ky. App. 2003).[13]

---

13. As explained in *Rivermont Inn*, Signature Point's claim is more properly characterized as one of equitable estoppel. However, we

decline to reverse based on a mere technicality in terminology where it is apparent the jury

Likewise, we agree with Signature Point that PBI cannot rely on the merger doctrine in this instance to bar consideration of Bouvette's promises to Hagan.

When the negotiations are completed by the execution of the contract, the transaction, so far as it rests on the contract, is merged in the writing. But false and fraudulent representations made by one of the parties to induce the other to enter into the contract, are not merged in the contract. Parol evidence is admissible to show that the making of the contract was procured by fraudulent representations. This does not vary the terms of the contract. *Sellards [Sellars] v. Adams*, 190 Ky. 723, 228 S.W. 424 [ (1921) ]; *Adams v. Fada Realty Co.*, 305 Ky. 194 [195], 195, 202 S.W.2d 439 [ (1947) ]. Even though the false representations relate to matters covered by a warranty in the contract, if the purchaser was induced to enter into the contract in reliance upon the false representations, he may maintain an action for rescission, or he may accept the contract and sue for damages suffered on account of the fraud or deceit.

*Bryant v. Troutman*, 287 S.W.2d 918, 920 (Ky. 1956). "One cannot contract against his fraud." *Id.* at 921.

Signature Point presented evidence sufficient to prove fraud by PBI in inducing it to enter into the deed in lieu agreement. Therefore, we do not believe that trial court erred in allowing the estoppel claim to go forward.

### B. Jury Instructions

"The purpose of jury instructions is to define the law on issues that are raised." *Keller v. Eldridge*, 471 S.W.2d 308, 310 (Ky. 1971). Proper jury instructions "guide jurors in applying the law correctly to the facts in evidence." *CSX Transp.,*

*Inc. v. Moody*, 313 S.W.3d 72, 82 (Ky. 2010). Kentucky law requires the use of "bare bones" jury instructions, leaving it to counsel to flesh out the case. *Olfice, Inc. v. Wilkey*, 173 S.W.3d 226, 229 (Ky. 2005). The concept of fleshing out bare bones instructions permits counsel to attempt to explain the instructions to the jury. *See id.* However, counsel is not expected or allowed to "correct erroneous jury instructions" as part of closing arguments. *Harp v. Commonwealth*, 266 S.W.3d 813, 820 (Ky. 2008).

Additionally, bare bones instructions may not be "so vague or diluted as to obscure the jury's findings. Indeed, to ensure a fair trial and avoid unnecessary appellate procedure, they must be sufficiently clear to reveal precisely the jury's conclusions." *Hilsmeier v. Chapman,* 192 S.W.3d 340, 344 (Ky. 2006). "All essential aspects of the law necessary to decide the case must be [correctly] integrated into the instructions." *Sargent v. Shaffer*, 467 S.W.3d 198, 209 (Ky. 2015).

We review objections to the "content of a jury instruction" under a *de novo* standard. *Id.* at 204. The standard required is one of "substantial correctness." We will not reverse for mere technicalities in the language of instructions. *See Cunningham v. Sublett's Adm'r*, 306 Ky. 701, 208 S.W.2d 509, 512 (1948) ("Mere inaptness of statement in the instructions is not a reversible error, if they are substantially correct."). Absolute perfection is not the standard. "If the statements of law contained in the instructions are substantially correct, they will not be condemned as prejudicial unless they are calculated to mislead the jury." *Peters v. Wooten*, 297 S.W.3d 55, 64–65 (Ky. App. 2009) (quoting *Ballback's Adm'r v. Boland–Maloney*

was properly instructed as to the essential elements.

*Lumber Co.*, 306 Ky. 647, 208 S.W.2d 940, 943 (1948)).

### 1. Fraud

■ The trial court instructed the jury on fraud as follows:

#### INSTRUCTION NO. 1: FRAUD

You will find in favor of Signature Point if you believe from clear and convincing evidence as follows:

a. PBI made one or more material misrepresentations to Scott Hagan to induce Signature Point to enter into the March 30, 2010, Right of First Refusal Agreement; and

b. PBI Bank made these material representations to Scott Hagan intending for Signature Point to rely upon one or more of the representations; and

c. Signature Point did rely upon one or more representations and entered into the Agreement, and its reliance was reasonable under the circumstances; and

d. That one or more of the representations made to Signature Point was false; and

e. That on or before March 30, 2010, Maria Bouvette had actual knowledge of MAKY's letter of intent dated March 25, 2010, and that Maria Bouvette knew the representation was false or made with reckless disregard for its truth or falsity; and

f. That as a result of Signature Point's reliance on PBI Bank's misrepresentations, Signature Point suffered damage.

Quoting only subsections (a), (b), and (f) of the instruction, PBI asserts that Instruction 1 improperly imputes third party representations onto it without a showing that PBI knew the representations were false. PBI goes on to explain that the error in the instructions is that PBI, as an entity, cannot make representations. "As is often the case, the devil is in the ellipses." *Kentucky Spirit Health Plan, Inc.*, 462 S.W.3d at 729. Subsection (e) makes clear

that not just any "third-party representations" are being imputed to PBI. To return a verdict in favor of Signature Point, the jury had to find that: "*Maria Bouvette had actual knowledge of MAKY's letter of intent dated March 25, 2010, and that Maria Bouvette knew the representation was false or made with reckless disregard for its truth or falsity.*" The instruction, as a whole, required the jury to consider only very specific statements of Bouvette. Moreover, the instruction was clear that Bouvette had to have actual knowledge of the statement's falsity or have acted with reckless disregard to its truth or falsity.

■ "The rule of imputation of wrong to a corporate employer, and its legal liability, embraces all tortious acts authorized by it or them in pursuance of any general, special or implied authority to act in its behalf on the subject to which they relate or which the corporation subsequently ratified." *Southeastern Greyhound Lines v. Harden's Adm'x*, 281 Ky. 345, 136 S.W.2d 42, 45 (1940). Bouvette was PBI's president. It is beyond dispute that her discussions with Signature Point were made in the scope of her employment. Therefore, those statements are properly considered statements of PBI. And, PBI is liable if those statements are determined to constitute fraud.

While the fraud instruction could possibly have been crafted with more precision, it did not materially misstate the law or omit an essential element. We cannot identify any reversible error with respect to the fraud instruction.

### 2. Negligence Instruction

■ The trial court instructed the jury on negligence as follows:

#### INSTRUCTION NO. 4: NEGLIGENCE

You will find in favor of Signature Point if you believe from the evidence as follows:

a. That PBI had a duty to protect Signature Point's confidential information; and

b. That PBI breached this duty by disclosing Signature Point's confidential business or financial information.

PBI asserts that the trial court's negligence instruction did not properly and intelligibly state the law because it omitted the requirements of causation and damages. PBI explains that finding it had a duty to Signature Point and then breached that duty does not create any presumption that such breach caused an injury, or that there was legal causation between the breach and the injury.

The main problem with PBI's argument, however, is that it failed to object to this aspect of the negligence instruction. PBI had a standing objection to any instruction that differed from its proposed instructions. This objection is of no help to PBI as to negligence because the instruction given by the trial court is almost identical to the instruction PBI proposed.

CR [14] 51(3) provides as follows: No party may assign as error the giving or the failure to give an instruction unless he has fairly and adequately presented his position by an offered instruction or by motion, or unless he makes objection before the court instructs the jury, stating specifically the matter to which he objects and the ground or grounds of his objection.

*Id.* The purpose of the rule is to "obtain the best possible trial at the trial court level by giv[ing] the trial judge an opportunity to correct any errors before instructing the jury." *Sand Hill Energy, Inc. v. Smith*, 142 S.W.3d 153, 162 (Ky. 2004) (footnotes and internal quotations omit-

ted). "It is well settled that a party may not on appeal complain of error in the instructions which was not called to the attention of the trial court either by objection (specifying the grounds) or by offered instructions." *Blankenship v. Staton*, 348 S.W.2d 925, 928 (Ky. 1961). Where an issue regarding jury instructions has not been properly preserved, we can only reverse if the error resulted in manifest injustice. *See Mo–Jack Distrib., LLC v. Tamarak Snacks, LLC*, 476 S.W.3d 900, 907 (Ky. App. 2015).

PBI's proposed instruction required two findings by the jury: "a. That PBI Bank had a duty to protect the Plaintiffs' confidential financial information; and b. That PBI Bank breached this duty by disclosing the Plaintiffs' confidential financial information." While we do not approve of the negligence instruction in this case, it mirrored PBI's proposed instruction. In closing arguments, counsel had the opportunity to, and did, make arguments concerning causation and damages. Additionally, negligence was one of many counts the jury returned in Signature Point's favor. Several of those counts, standing alone, support the jury's ultimate award. In sum, we cannot conclude that the trial court's failure with respect to the negligence instruction resulted in a manifest injustice.

### *3. Tortious Interference Instruction*

The trial court instructed the jury on tortious inference with a prospective business advantage as follows:

You will find in favor of Signature Point if you believe from the evidence as follows:

a. That on or before March 30, 2010, Signature Point had a right to obtain a release of PBI Bank's mortgages on the

---

14. Kentucky Rules of Civil Procedure.

apartment tract for a payment of $2,835,000.00; and

b. That prior to March 30, 2010, PBI Bank was aware of MAKY's willingness to purchase the apartment tract for up to $3,800,000.00; and

c. That PBI Bank intentionally concealed MAKY'S willingness to purchase the apartment tract for up to $3,800,000.00; and

d. That PBI's motive for concealing MAKY's willingness to purchase the apartment tract for up to $3,8000,000.00 was improper; and

e. That but for PBI Bank's concealment of MAKY's willingness to purchase the apartment tract for up to $3,800,000.00 Signature Point would have obtained a release on the apartment tract for $2,835,000.00; and

f. That Signature Point suffered damages as a result.

PBI argues that the jury instructions are legally deficient because they omit the requirement of "malice." "It is clear that to prevail [on a tortious interference claim] a party seeking recovery must show malice or some significantly wrongful conduct." *Hornung*, 754 S.W.2d at 859. In this context, however, malice simply means "intentional interference without justification." *Id.* "This analysis turns primarily on motive." *Snow Pallet, Inc.*, 367 S.W.3d at 6.

■ We are not convinced that the tortious interference jury instruction was required to include the term "malice." As noted in *Hornung*, actual malice is not required and the tort may be established by demonstrating "some significantly wrongful conduct." *Hornung*, 754 S.W.2d at 859. The trial court's instruction requiring a finding that PBI acted with an "improper motive" coupled with the opportunity for counsel to elaborate on the instructions in closing satisfied the bare bones approach to jury instructions under Kentucky law.

## C. Inconsistent Jury Verdict

■ PBI seeks a retrial based on its assertion that the jury instructions resulted in an inconsistent verdict on the issue of fraud, which it claims "constitutes an illogical result that cannot be reconciled by the evidence of the case, meaning a retrial is required." PBI explains that the jury rendered an inconsistent verdict because it found in favor of Signature Point on the fraud claim, but against it on the fraudulent omission claim.

■ This claim was not properly preserved by PBI. Where the inconsistency is discernable on the face of the verdict, it is "incumbent on any party who was adversely affected to object thereto and give the court an opportunity to send the jury back to reconsider its verdict or to correct its findings." *Breathitt Funeral Home v. Neace*, 437 S.W.2d 490, 492 (Ky. 1969). The failure to do so constitutes a waiver of the objection. *Id.* Having reviewed the verdict, we believe that the error complained of should have been apparent to PBI from the face of the verdict. Because PBI failed to timely object so that the alleged error could be considered and, if necessary, corrected before the jury was discharged, PBI waived its ability to rely on the error on appeal.

Even if the error had been timely raised, however, we do not believe it would have compelled any action by the trial court. In *Emberton v. GMRI, Inc.*, 299 S.W.3d 565, 580–81 (Ky. 2009), our Supreme Court explained:

In the civil context, "[t]he true test to be applied in reconciling apparent conflicts between the jury's answers is whether the answers may fairly be said to represent a logical and probable decision on the relevant issue as submitted." *Callis v. Owensboro–Ashland Co.*, 551 S.W.2d 806, 808 (Ky.App.1977) (citing *Miller v. Royal Neth. Steamship Co.*, 508 F.2d

1103, 1108 (5th Cir.1975)). "We therefore must attempt to reconcile the jury's findings, by exegesis, if necessary ... before we are free to disregard the jury's verdict and remand the case for a new trial." *Miller,* 508 F.2d at 1107 (quoting *Gallick v. Baltimore & Ohio R.R. Co.,* 372 U.S. 108, 119, 83 S.Ct. 659, 9 L.Ed.2d 618 (1963)).

*Id.*

We believe the jury's verdict on the fraud claims can be easily reconciled. Fraud and fraudulent omission are two separate actions. Fraud by omission requires the plaintiff to show: (1) that the defendants had a duty to disclose a fact or facts, (2) that the defendants failed to disclose such fact, (3) that the failure to disclose induced the plaintiff to act, and (4) that the plaintiff suffered actual damages therefrom. *Rivermont Inn, Inc.,* 113 S.W.3d at 641. However, a duty to disclose is only created where a fiduciary or confidential relationship exists between the parties, where such duty is imposed by statute, or where the defendant has already partially disclosed facts creating the impression that a full disclosure had been made. *Id.* In contrast, fraud requires an *actual* misrepresentation of a material fact. *Commonwealth v. Harkness' Adm'r,* 197 Ky. 198, 246 S.W. 803, 804 (1923).

Based on the evidence, it was entirely possible for the jury to conclude that Bouvette mispresented rather than omitted a relevant fact. In our opinion, far from being inconsistent, the verdict delivered by the jury demonstrates that the jurors had a firm grasp on the facts presented to them as well as the law they were instructed to apply.

### D. Compensatory Damages

PBI next asserts that we should vacate the jury's compensatory damages verdict because it was impermissibly vague and ambiguous as to damages. The verdict form provided to the jurors stated:

### VERDICT FORM A

We the jury find for Signature Point and award damages in the following amount.

$ _____ (not to exceed $11,700,000)

$_____ (out of pocket damages—not to exceed $974,000)

$_____ (lost opportunity damages—not to exceed $865,000)

The jury awarded nothing under the first blank and then $650,000 and $865,000, respectively, under the second and third blanks. PBI argues that the general nature of the verdict form makes it is impossible to see how jurors allocated damages to any particular claim made by Signature Point. Alternatively, PBI asserts that the damages are impermissibly speculative and uncertain.

As an initial matter, this alleged error was not properly preserved. PBI submitted a damages instruction even *less* specific than the instruction the trial court provided to the jury. PBI's proposed jury instruction No. 22 states:

If you have found for the Plaintiff under Instruction No. 2, 3 and 4, what total sum of damages do you find that Plaintiffs have sustained by virtue of Defendants' breach of contract, fraud, detrimental reliance and breach of fiduciary duty.

Lost Profits:

_____

Not to Exceed $11,700,000.00

Total: _____.

After the instructions were finalized to include nine separate counts, PBI was free to move the trial court for separate damage interrogatories. It did not. Instead, PBI simply asked the trial court to add the two additional lines of recovery, which

were included in the final verdict submitted to the jury.

Furthermore, PBI failed to request the trial court to send the jury back for a more specific allocation. "If [PBI] desired the verdict to be more specific, we think it was [its] duty to ask the court to have the jury so make it. Failing to do so, [it] waived any right to raise the question." *Scobee v. Donahue*, 291 Ky. 374, 164 S.W.2d 947, 950 (1942).

▇▇▇ Even if this claim had been properly preserved, we do not see error in either the instructions or the verdict. Pursuant to CR 49.02, a court "may submit to the jury, together with appropriate forms for a general verdict, written interrogatories upon one or more issues of fact the decision of which is necessary to a verdict." Thus, CR 49.02 makes clear that a general verdict is permissible. Furthermore, "we have never held it incumbent upon a jury to state how or by what method of calculation it arrived at its verdict. It is sufficient if the amount is sustained by the evidence." *Scobee*, 164 S.W.2d at 949. The "out of pocket damages" were amounts paid by Signature Point on the project that came from borrowing funds from Hagan. The "lost opportunity damages" were the profits Signature Point would have realized had it been informed of the first letter of intent and sold the Apartment Tract to Managed Assets instead of agreeing to the deed in lieu of foreclosure. Signature Point submitted sufficient proof to sustain the amounts awarded to it for compensatory damages.

### E. Punitive Damages

▇▇▇ "Punitive damages existed at common law, and have been part of the fabric of Anglo–American and Kentucky jurisprudence for centuries." *MV Transp., Inc. v. Allgeier*, 433 S.W.3d 324, 337 (Ky. 2014). "Such damages are given to the plaintiff over and above the full compensa-tion for his injuries, for the purpose of punishing the defendant, of teaching him not to do it again, and of deterring others from following his example." *Hensley v. Paul Miller Ford, Inc.*, 508 S.W.2d 759, 762 (Ky. 1974) (quoting Prosser, Law of Torts 4th Ed. § 2). "In order to justify punitive damages there must be first a finding of failure to exercise reasonable care, and then an additional finding that this negligence was accompanied by wanton or reckless disregard for the lives, safety, or property of others." *Nissan Motor Co., Ltd. v. Maddox*, 486 S.W.3d 838, 840 (Ky. 2015) (quoting *Gibson v. Fuel Transport, Inc.*, 410 S.W.3d 56, 59 (Ky. 2013)).

The punitive damages instruction in this case provides:

If you answered "yes" to any Interrogatory Nos. 1 [Fraud], Interrogatory No. 2 [Fraudulent Omission–Failure to Disclose Interest in Apartment Land]], Interrogatory No. 3 [Fraudulent Omission–Omission of Financing Contingency/Arrangement in Managed Sales Contract], Interrogatory No. 4 [Negligence], Interrogatory No. 5 [Breach of Fiduciary Duty] or Interrogatory No. 6 [Tortious Interference with Prospective Business Advantage], thereby finding in favor of Signature Point, and awarded damages, if you are further satisfied by clear and convincing evidence that PBI Bank acted with fraud or in reckless disregard for Signature Point's rights or property with the intention to cause injury to Signature Point and that PBI Bank authorized, ratified, or should have anticipated the conduct, you may in your discretion award punitive damages against PBI in addition to the compensatory damages. Punitive damages are awarded against PBI Bank for the purpose of punishing PBI Bank for its misconduct in this case and to deter it and other from engaging in similar conduct in the future.

In determining the amount of punitive damages to be assessed you should consider the following factors:

(a) the likelihood at the relevant time that serious harm would arise from PBI Bank's misconduct;

(b) the degree of the defendant's awareness of that likelihood;

(c) the profitability of the misconduct to PBI Bank;

(d) the duration of the misconduct and any concealment of it by PBI Bank; and

(e) the harm to Signature Point as measured by the compensatory damages; and

(f) any actions by PBI Bank to remedy the misconduct once it became known to PBI Bank.

PBI argues Signature Point was not entitled to a punitive damages instruction because there was no evidence that PBI intended to harm Signature Point. The trial court rejected this argument on the basis that "[t]here was ample evidence in the record that PBI committed fraud and interfered with Signature Point's business. Also, there is evidence that PBI acted negligently in its dealings with Signature Point's private information." We agree.

 Kentucky law does not limit punitive damages to specific torts. "This is because the misconduct involved cuts across the spectrum of tort litigation, rather than being restricted to one type of tort or one type of injury." *Fowler v. Mantooth*, 683 S.W.2d 250, 252 (Ky. 1984). "The threshold for the award of punitive damages is misconduct involving something more than merely commission of the tort." *Id.* The "something more" is "conscious wrongdoing" or malice. *Id.* "Malice may be implied from outrageous conduct, and need not be expressed so long as the conduct is sufficient to evidence conscious wrongdoing." *Id.* Additionally, in considering punitive damages, our Supreme Court has recognized that "a person is presumed to

intend the logical and probable consequences of his conduct." *Saint Joseph Healthcare, Inc. v. Thomas*, 487 S.W.3d 864, 871 (Ky. 2016) (quoting *Parker v. Commonwealth*, 952 S.W.2d 209, 212 (Ky. 1997)).

In this case, we agree with the trial court that the evidence supported a conclusion that PBI desired to rid itself of the Signature Point loans, and worked behind Signature Point's back to acquire the property by fraudulently representing that it was not aware of any party interested in purchasing the property, and by making promises it never intended to keep. In so doing, PBI took for itself a business opportunity that should have gone to its customer. Signature Point's loss of the ability to realize a profit on the Apartment Tract was the logical and probable consequence of PBI's fraud. The jury instruction incorporating that basis for punitive damage liability was proper. PBI was not entitled to a directed verdict on this aspect of the case.

 PBI next argues that even if it was proper to allow the jury to consider punitive damages, the amount awarded is excessive. "The Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416, 123 S.Ct. 1513, 1519–20, 155 L.Ed.2d 585 (2003). In *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996), the United States Supreme Court identified three guideposts courts should employ to evaluate whether a punitive damages award is unconstitutionally excessive: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil

penalties authorized or imposed in comparable cases. *Id.* "Courts of Appeals should apply a *de novo* standard of review when passing on ... determinations of the constitutionality of punitive damages awards." *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 436, 121 S.Ct. 1678, 1685–86, 149 L.Ed.2d 674 (2001).

■■■ The first guidepost, which is the "most important indicium of the reasonableness of a punitive damages award," *Gore*, 517 U.S. at 575, 116 S.Ct. at 1599, requires the review of a variety of factors: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident. *Campbell*, 538 U.S. at 419, 123 S.Ct. at 1521. *Campbell* further explains "the existence of any one of these factors weighing in favor of a plaintiff may not be sufficient to sustain a punitive damages award; and the absence of all of them renders any award suspect." 538 U.S. at 419, 123 S.Ct. at 1521.

The injuries in this case were purely economic. No physical injury to a person occurred. Furthermore, since only a corporation was harmed, we cannot say that PBI's conduct placed the "health and safety" of others at risk. The target of the conduct in this case, however, did have significant "financial vulnerability" during this time period. The fact that the housing market crashed in 2010 meant that Signature Point was not able to sell the units it

had constructed. Like many other individuals and companies, it suddenly found itself in dire financial straits, a fact of which PBI was well aware. Over a period of many months, PBI took action to market the property to Managed Assets and to hide and conceal Managed Assets' interest from Signature Point. Finally, the jury concluded that PBI's conduct was fraudulent. This factor weighs *heavily* in favor of Signature Point because evidence of trickery or deceit is indicative of reprehensibility. *See Campbell*, 538 U.S. at 419, 123 S.Ct. at 1521. On the balance, we conclude that this factor supports both the fact and amount of punitive damages awarded to Signature Point.

*Campbell* emphasized that there is no "bright-line ratio which a punitive damages award cannot exceed." 538 U.S. at 425, 123 S.Ct. at 1524. However, *Campbell* also recognized that "in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* "Thus, while the Supreme Court has made it clear that the question is not governed by a mathematical formula, it is equally clear that punitive/compensatory damage ratios of 10:1 and greater are burdened with at least the appearance of unconstitutionality and cannot survive appellate scrutiny in the absence of special circumstances." *Saint Joseph Healthcare, Inc.*, 487 S.W.3d at 879–80 (Ky. 2016).

The ratio in this case is just a little more than three to one. This type of single digit ratio is well within the realm of reasonableness necessary to pass muster under the United States Constitution, and is supported by the facts in this case.[15] "[T]he

---

**15.** Our Supreme Court recently upheld a punitive damages ratio of 386 to 1. In so doing, the Court analyzed the unique circumstances of the case and concluded that the verdict was justified. *Saint Joseph Healthcare, Inc.*, 487

S.W.3d at 880. While the facts in *Saint Joseph* resulted in personal injury and conduct far more egregious than this case, we believe that *Saint Joseph* illustrates why courts should ex-

disparity between the punitive award and the potential harm does not, in our view, 'jar one's constitutional sensibilities.'" *TXO Prod. Corp. v. All. Res. Corp.*, 509 U.S. 443, 462, 113 S.Ct. 2711, 2722, 125 L.Ed.2d 366 (1993).

 Finally, we must consider the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct. *Gore*, 517 U.S. at 583, 116 S.Ct. at 1602–03. "The purpose of this guidepost reflects an elementary principle of due process—namely, that the defendant must have been provided 'fair notice' that its conduct would subject it to a penalty on the order of the punitive damages award." *Romanski v. Detroit Entm't, L.L.C.*, 428 F.3d 629, 648 (6th Cir. 2005). While we have not been cited to any particular criminal or civil statutes, it has long been the law in this Commonwealth that fraudulent conduct is an appropriate basis for the award of punitive damages. Under these circumstances, PBI should have been on notice that engaging in intentional fraud could subject it to punitive damages in line with what the jury awarded in this case. Given the relatively low ratio coupled with the highly reprehensible conduct of outright fraud on one's customer, we do not believe the punitive damages in this case violate either Kentucky law or the United States Constitution.[16]

## F. Post–Judgment Interest

 PBI's final assignment of error is that the trial court abused its discretion by refusing to lower the 12% post-judgment interest rate. Post-judgment interest is covered by KRS[17] 360.040. It provides:

A judgment shall bear twelve percent (12%) interest compounded annually from its date. A judgment may be for the principal and accrued interest; but if rendered for accruing interest on a written obligation, it shall bear interest in accordance with the instrument reporting such accruals, whether higher or lower than twelve percent (12%). Provided, that when a claim for unliquidated damages is reduced to judgment, such judgment may bear less interest than twelve percent (12%) if the court rendering such judgment, after a hearing on that question, is satisfied that the rate of interest should be less than twelve percent (12%). All interested parties must have due notice of said hearing.

KRS 360.040. "The statute's purpose is to encourage a judgment debtor to promptly comply with the terms of the judgment and to compensate the judgment creditor for the judgment debtor's use of his money." *Strunk v. Lawson*, 447 S.W.3d 641, 650 (Ky. App. 2013). While a trial court has the discretion to lower the post-judgment interest rate, it is not required to do so. "The statutory language clearly indicates

---

amine individual cases, not apply rigid mathematical formulas.

16. Having surveyed the law, it is fair to say that as compensatory damages go up in amount, courts are more likely to insist on lower ratios. Ratios approaching 10:1 have been upheld in cases where the defendant's conduct is highly reprehensible, but the amount of compensatory damages is under a million dollars. *See, e.g., Collins Entm't Corp. v. Coats and Coats Rental Amusement*, 355 S.C. 125, 584 S.E.2d 120 (S.C. App. 2003). Cases where the compensatory damages are

in the low millions have upheld ratios similar to the ratio in this case. *Rhone–Poulenc Agro, S.A. v. DeKalb Genetics Corp.*, 345 F.3d 1366 (Fed. Cir. 2003) ("DeKalb contends that, under State Farm, the $50 million in punitive damages unconstitutionally exceeded the $15 million in compensatory damages awarded by the jury. That argument does not withstand scrutiny."). As the amount of compensatory damages rises over twenty million dollars, courts become more likely to require ratios to be closer to 1:1.

17. Kentucky Revised Statutes.

that the decision to fix the post-judgment rate of interest at less than 12% is one necessarily left to the sound discretion of the trial court." *Univ. Med. Ctr., Inc. v. Beglin*, 432 S.W.3d 175, 178–79 (Ky. App. 2014). PBI asserts that the trial court abused that discretion because the 12% interest rate is drastically out-of-line with the much lower prime rate.

In *Morgan v. Scott*, 291 S.W.3d 622 (Ky. 2009), the Supreme Court of Kentucky soundly rejected the judgment debtor's contention that the post-judgment interest rate should have been lowered because evidence of the current market rates demonstrated that a lower interest rate was appropriate. "[T]he fact that a trial court could have chosen to impose a lower interest rate does not necessarily mean that its decision to impose a higher rate was an abuse of discretion." *Id.* at 644. The court observed that "the fact that a twelve percent interest rate in today's economic climate may be well above the marketplace norm is a matter properly to be considered by the General Assembly."[18] *Id.* The court held that literal compliance with the terms of the statute did not imply an abuse of the trial court's discretion. *See also GMRI, Inc.*, 299 S.W.3d at 585.

▬▬ In sum, we cannot identify any abuse of discretion in this case. "Although a trial court may consider the effects of the recent economic downturn in determining whether to award a lower interest rate on post-judgment interest, it is not obligated to do so." *Beglin*, 432 S.W.3d at 181 (J. Maze, concurring). The fact that the trial court could have chosen to impose a lower interest rate does not mean that its decision to stick with the 12% default statutory rate was an abuse of discretion.

After PBI lost on its initial motion to lower the interest rate, it filed a second motion, asking the trial court to retroactively reduce the interest rate entered on September 26, 2013, and apply interest only to the compensatory portion of the damages award. By this time, PBI's appeal was already pending before this Court. The trial court ruled that while CR 73.06 allowed it to consider and make rulings concerning surety matters while a matter was pending on appeal, that rule did not encompass matters related to the post-judgment interest rate.

The trial court had previously denied PBI's motion for lower interest than the default twelve percent. PBI appealed that order. The appeal was pending before this Court when PBI sought further review by the trial court. The trial court correctly refused to consider the interest matter, a distinct issue from the sufficiency of the surety bond. Furthermore, KRS 360.040 refers to all "judgments." We believe that had the General Assembly intended to exclude punitive damages from post-judgment interest, it would have so stated.

### IV. CONCLUSION

For the foregoing reasons, we affirm the judgment and orders of the Jefferson Circuit Court.

STUMBO, JUDGE, CONCURS.

MAZE, JUDGE, CONCURS IN PART AND DISSENTS IN PART WITH SEPARATE OPINION.

MAZE, JUDGE, CONCURRING IN PART AND DISSENTING IN PART:

I fully agree with the reasoning and result of the majority's well-written opin-

---

18. To this end, we note that on February 22, 2016, Kentucky Senate Bill No. 208 was introduced on the Senate Floor. This Bill sought to lower the post-judgment interest rate from 12% to 6%. The Bill did not leave the Senate prior to the end of the 2016 session, and therefore, was never enacted into law.

ion, except as to punitive damages. Furthermore, I agree with the majority that the trial court properly submitted the question of punitive damages to the jury and that the evidence in this case supported an award of punitive damages. However, the more difficult question presented in this appeal is whether the amount of punitive damages awarded by the jury was constitutionally excessive in light of the standards set out by the United States Supreme Court in *State Farm Mut. Auto. Ins. Co. v. Campbell,* 538 U.S. 408, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003) and *BMW of N. America v. Gore,* 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996). Although I am loathe to set aside a jury award, I must conclude that the amount of punitive damages awarded was excessive in light of the specific circumstances in this case.

As the majority correctly notes, the United States Supreme Court in *State Farm* held that "[i]n order to satisfy due process, punitive damage awards must be evaluated under three factors: "(1) the degree of reprehensibility of the defendant's conduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the civil penalties authorized or imposed in comparable cases." 538 U.S. at 418, 123 S.Ct. at 1520. Appellate courts must review a trial court's application of these factors on a *de novo* basis. *Id.* at 418, 123 S.Ct. at 1520.

Of the three factors, "the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Id.* (citing *Gore,* 517 U.S. at 575, 116 S.Ct. at 1599). *State Farm* instructs courts to determine the reprehensibility of a defendant by considering whether: the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disre-

gard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

*Id.* at 419, 123 S.Ct. at 1521 (citing *Gore,* 517 U.S. at 576–577, 116 S.Ct. at 1599–1600).

In the current case, the harm that PBI caused was entirely economic. Furthermore, Signature Point and Hagan had a great deal of experience in this type of development, including working with lenders. The majority suggests that Signature Point was in a financially vulnerable position due to the economic climate and its inability to sell condominium units that it had constructed. However, Signature Point had placed itself in this situation when it entered into the 2009 Global Settlement Agreement with PBI. By early 2010, both parties knew that Signature Point would likely default on the loan when it came due in March 2010. PBI would have been fully within its rights to foreclose on the property at that time.

Instead, PBI agreed to take the property as a deed in lieu of foreclosure, along with a full release of all loan obligations and personal guarantees. I agree with the majority that PBI engaged in deception and trickery by secretly marketing the property to Managed Assets and by directly misrepresenting that no other parties were interested in the property. However, this deceit was an isolated incident involving a single transaction. Although the intentional misconduct merited an award of punitive damages, the presence of only a single reprehensibility factor weighs against a higher award.

With regard to the second factor, the Court in *State Farm* suggested that "'few awards exceeding a single-digit ratio be-

tween punitive and compensatory damages, to a significant degree, will satisfy due process." *Id.* at 425, 123 S.Ct. at 1524. While a higher ratio may be appropriate where a particularly egregious act has resulted in only a small amount of economic damages, it is clearly excessive where it is an award of substantial compensatory damages. *Ragland v. DiGiuro*, 352 S.W.3d 908, 921–24 (Ky. App. 2010). And as the majority correctly notes, the United States Supreme Court has consistently rejected a bright-line ratio or mathematical formula to determine the reasonableness of a punitive damages award. *State Farm*, 538 U.S. at 424–25, 123 S.Ct. at 1524. Consequently, I would agree with the majority's initial holding that a 3.65:1 ratio of punitive to compensatory damages was not excessive *per se.*

*State Farm* makes clear, however, that this guidepost involves more than a simple comparison to other ratios. "The precise award in any case . . . must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff." *Id.* at 425, 123 S.Ct. at 1524. The Court in *State Farm* further noted that, "when compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." *Id.* Similarly, the Sixth Circuit has reduced punitive damages to a 1:1 ratio based on the high amount of compensatory damages and the limited number of reprehensibility factors. *See Burton v. Zwicker & Assocs., PSC*, 577 Fed.Appx. 555, 566 (6th Cir. 2014), *cert. denied*, ––– U.S. ––––, 135 S.Ct. 1531, 191 L.Ed.2d 560 (2015); *Morgan v. New York Life Ins. Co.*, 559 F.3d 425, 442 (6th Cir. 2009); *Bridgeport Music, Inc. v. Justin Combs Pub.*, 507 F.3d 470, 487–88 (6th Cir. 2007); *Bach v. First Union Nat'l Bank*, 149 Fed.Appx. 354, 356 (6th Cir. 2005).

The third *State Farm* factor requires the court to compare the punitive damages award to any civil penalties authorized or imposed in comparable cases. The existence of such penalties has a bearing on the seriousness with which a state views the wrongful action. *State Farm*, 538 U.S. at 428, 123 S.Ct. at 1526. The majority concedes that neither party has identified any particular criminal or civil penalty for comparable misconduct, other than the general availability of punitive damages for fraudulent conduct. Thus, this factor has limited application in evaluating whether the punitive damages award was constitutionally excessive.

Punitive damages are not compensation for injury. They serve to punish reprehensible conduct and to deter its future occurrence. *Cooper Indus., Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 432, 121 S.Ct. 1678, 1683, 149 L.Ed.2d 674 (2001) (citing *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 54, 111 S.Ct. 1032, 1062, 113 L.Ed.2d 1 (1991) (O'Connor, J., dissenting)). In this case, the jury found that PBI's conduct involved intentional misrepresentation and deceit. But Signature Point was not financially vulnerable except to the extent that it was already very likely to default on this loan. By diverting the business opportunity to Managed Assets, PBI sought to benefit itself at the expense of Signature Point. However, the record is not clear whether Signature Point would have been able to complete the development project even if PBI had extended additional financing. Thus, while PBI's misconduct cost Signature Point its out-of-pocket expenses and the opportunity for additional profits, Signature Point also avoided the risks of either foreclosure or the uncertainties of going forward with the project.

The jury awarded Signature Point substantial compensatory damages for these losses, totaling $1,515,000.00. The infliction

of only economic harm can still merit a substantial penalty, especially when done intentionally through affirmative acts of misconduct. But not all acts which cause economic harm are sufficiently reprehensible to justify a significant sanction in addition to compensatory damages. *Gore*, 517 U.S. at 576, 116 S.Ct. at 1599.

There are no clear standards for an appellate court to evaluate whether an award of punitive damages is constitutionally excessive. The guideposts set out in *State Farm* and *Gore* are fact-specific, yet they also compel a *de novo* review on our part. This Court has faced the challenge of addressing this complex analysis on numerous occasions.[19] I invite our Supreme Court to address this matter and to set out a consistent standard for reviewing punitive damages award.

Until such time, this Court must make that determination on a case-by-case basis, using the *State Farm* and *Gore* guideposts. Under these standards, we must evaluate the ratio of punitive to compensatory damages against the number and severity of the reprehensibility factors. Here, the jury found that PBI engaged in intentional misrepresentation. On the other hand, the injury caused was entirely economic, the misconduct related only to a single transaction, the plaintiffs were sophisticated business entities, and the plaintiffs were made whole through a substantial award of compensatory damages.

Under the circumstances, I believe that the goals of punishment and deterrence would be served sufficiently by the imposition of punitive damages equaling no more than the amount of compensatory damages; or a 1:1 ratio. Such damages would adequately punish PBI for its misconduct without exceeding the scope of constitutional due process. Therefore, I would vacate the award of punitive damages and remand this matter for entry of a new award of punitive damages not to exceed $1,515,000.00.

---

19. I recently presided on a panel addressing whether an award of punitive damages was excessive. Although the defendant's conduct in that case was arguably more reprehensible than PBI's, the majority concluded that due process would not support a punitive damages ratio greater than 1:1. *Grant Thornton, LLP v. Yung*, No. 2014–CA–001957–MR, —— S.W.3d ——, 2016 WL 4934672 (Ky. App. Sept. 16, 2016, *modified* Sept. 30, 2016). In the interest of consistency, I cannot reach a different conclusion in this case.